146 P.3d 1066

**DEL MONTE FRESH PRODUCE (HAWAII), INC.; Edward C. Littleton; Stacie Sasagawa; Gordon Rezentes; and Dixon Suzuki, Appellants–Appellants,**

v.

**INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 142, AFL–CIO, Union–Appellee–Appellee,**

and

**Hawaii Labor Relations Board; Brian K. Nakamura, Chairperson Chester C. Kunitake, Board Member; and Kathleen Racuya–Markrich, Board Member, Appellees–Appellees.**

No. 27265.

Supreme Court of Hawai'i.

Nov. 14, 2006.

Barry W. Marr and Christopher S. Yeh (of Marr Hipp Jones & Wang), Honolulu, on the briefs, for appellants-appellants Del Monte Fresh Produce (Hawaii), Inc., Edward C. Littleton, Stacie Sasagawa, Gordon Rezentes, and Dixon Suzuki.

Herbert Takahashi and Rebecca L. Covert (of Takahashi, Masui, Vasconcellos & Covert), Honolulu, on the briefs, for Union-appellee-appellee International Longshore and Warehouse Union Local 142, AFL–CIO.

Valri Lei Kunimoto, on the record, Honolulu, for appellees-appellees Hawaii Labor Relations Board; Brian K. Nakamura, Chairperson Chester C. Kunitake, Board Member; and Kathleen Racuya–Markrich, Board Member.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; with ACOBA, J., concurring in the result.

Opinion of the Court by DUFFY, J.

Appellant-appellants Del Monte Fresh Produce (Hawaii), Inc., Edward C. Littleton, Stacie Sasagawa, Gordon Rezentes, and Dixon Suzuki[1] [hereinafter, collectively, Del

---

1. The named individuals hold the following positions: Edward C. Littleton, General Manager for Hawai'i (Del Monte); Stacie Sasagawa, Manager for Human Resources (Del Monte); Gordon Rez- entes, Manager of Processing Operations (Del Monte); and Dixon Suzuki, Labor Relations Consultant for the Hawai'i Employers Council.

Monte] appeal from the April 1, 2005 final judgment of the Circuit Court of the First Circuit,[2] affirming the Hawaii Labor Relations Board's (HLRB) ruling in favor of appellee-appellee International Longshore and Warehouse Union, Local 142, AFL–CIO [hereinafter ILWU or Union] in a labor dispute arising out of the downsizing and relocation of Del Monte's chilled and frozen fruit operations facility in Honolulu.

On appeal, Del Monte argues that: (1) the HLRB erred in finding that Del Monte violated Hawai'i Revised Statutes (HRS) § 377–6(4) (1993) by refusing to bargain in good faith with the Union; (2) the HLRB erred in finding that Del Monte interfered with or discriminated against the Union, in violation of HRS §§ 377–6(1) and (3), in an "inherently destructive" manner; and (3) the HLRB's remedial order, which, among other things, required Del Monte to award certain laid-off workers "enhanced separation benefits identified in previous negotiations or the cash value thereof," was in violation of the HLRB's statutory authority.

As discussed below, we affirm the circuit court's rulings upholding the HLRB's conclusion that Del Monte committed unfair labor practices under HRS § 377–6(4), for failing to meet its bargaining obligation, and under HRS § 377–6(1), for interfering with the exercise of guaranteed employee rights, because there was sufficient evidence to support both charges. However, we reverse the circuit court's decision regarding HRS § 377–6(3) because the HLRB incorrectly interpreted the law, applying an erroneous understanding of what activity can constitute "discrimination." Lastly, we hold that the HLRB has broad statutory authority under HRS § 377–9(d) to craft remedies for unfair labor practices, and that the remedy in this case was not an abuse of discretion.

Therefore, we affirm in part and reverse in part the circuit court's April 1, 2005 final judgment.

---

**2.** The Honorable Sabrina S. McKenna presided over this matter.

## I. BACKGROUND

### A. Facts

Del Monte Fresh Produce (Hawaii), Inc. grows and sells whole pineapple and processed pineapple products. The company is part of a larger corporation, the Del Monte Fresh Produce Company, which has headquarters in Coral Gables, Florida. At the time this action arose, Del Monte's Hawai'i operations consisted of three units: the O'ahu Plantation [hereinafter, Plantation], where pineapples are grown and harvested; Kunia Processing and Packing Operations unit, also known as Kunia Fresh Fruit [hereinafter, KFF], where pineapples are packaged whole or processed and made into concentrate juice; and the Waiakamilo Honolulu Chilled/Frozen Operation [hereinafter, HCFO], where pineapples are processed into chilled pineapple products.

The ILWU, Local 142 has been the exclusive bargaining representative of Del Monte employees since 1945. The employees are organized into three separate bargaining units, which correspond to the three Del Monte operations: Plantation, KFF, and HCFO. Each bargaining unit has its own collective bargaining agreement, with separate seniority systems within the unit. In addition to these Union employees, Del Monte employs "seasonal" employees whose employment is not covered by the collective bargaining agreement until they have worked 100 days for the company, at which point they become "covered seasonal." [3]

#### 1. Del Monte's Plan to Relocate the HCFO Facility

In September 2001, Del Monte's corporate parent decided to relocate HCFO work to Sanger, California. In March 2003, a decision was made to keep limited HCFO work in Hawai'i (for the local market), but to transfer this work to the KFF concentrate facility, closing the Waiakamilo HCFO facility.

---

**3.** "Covered seasonal" workers, while covered by the collective bargaining agreement, are entitled to fewer benefits than "regular" employees. *See infra* note 6.

On April 11, 2003, the company informed the Union of these plans through a letter sent to the Union, HCFO employees, and the Director of the Department of Labor and Industrial Relations. In the letter, the company indicated that it would lay off sixty-seven of seventy-seven HCFO employees, effective June 30, 2003. The letter also stated that Del Monte had 154 vacancies at the Plantation and KFF facility to which all displaced workers could apply.

On May 30, 2003, Del Monte posted vacancies for fourteen HCFO positions that would work in the Kunia plant.

By June 1, 2003, Del Monte and its parent company had finalized plans to merge operations at Kunia. Under this plan, a downsized processing unit at KFF would be made up of fourteen HCFO positions who would process pineapple and make concentrate. Further, Del Monte wished to transfer two permanent KFF employees who had worked in concentrate into the new HCFO bargaining unit at Kunia. The relocated HCFO employees would provide limited fresh fruit production in addition to operating the concentrate plant, while the rest of the KFF employees would return to the Fresh Fruit operation.

Del Monte set July 1, 2003 as the date to have the HCFO operations up and running in Kunia.

### 2. The Union Requests Information Regarding the Relocation and Files an Unfair Labor Practice Charge with the HLRB.

On April 22, 2003, the ILWU requested to bargain with Del Monte over the decision to close the HCFO plant and its effects. At the same time, the Union requested information from the company related to the decision to close the HCFO plant and lay off, transfer, and reassign its employees as a result, as well as a request for information related to the effects of the closing. Del Monte responded by providing some information and by engaging in effects bargaining.[4]

On May 12, 2003, the Union filed an unfair labor practice complaint with the HLRB, alleging that Del Monte refused to bargain collectively, refused to provide information, and interfered with, restrained, and coerced its employees "in the exercise of their Section 7 rights under the Act."[5]

In the second week of June 2003, the parties commenced bargaining sessions concerning the effects of the closure, including layoffs and benefits.

### 3. Del Monte and the Union Engage in Bargaining Over the Effects of the HCFO relocation.

The parties met on June 10, 12, 17, and 21, 2003. Del Monte's bargaining committee met with the Union at the Union's own hall making itself available for each of these sessions and never refusing to meet with the Union.

At the first effects bargaining meeting, on June 10, 2003, the Union proposed the following:

(1) Enhanced severance benefits for laid-off HCFO workers, consisting of two additional days of pay for each year of service, with both lump-sum and installment pay options.

(2) Allowing the use of pre-tax severance benefits to pay for extended medical coverage for laid-off workers.

(3) Extended housing for one month of each year of service at current rental rates

---

4. The parties dispute the extent of Del Monte's responsiveness to the Union's information requests. The HLRB determined that while Del Monte refused to provide information or negotiate regarding its decision to close the facility, it did provide other information and bargain over effects. However, the HLRB did not determine whether Del Monte's conduct in response to information requests was an unfair labor practice because it rested its finding of a failure to bargain on other evidence.

5. This charge was later amended by the Union to allege a violation of HRS § 377–6(1), due to interference, restraint, or coercion of the employees in the exercise of their rights under HRS § 377–4. The ILWU also requested to amend its complaint to include a charge under HRS § 377–6(6), alleging that Del Monte violated the terms of the collective bargaining agreement. Like the failure to provide information charge, the HLRB did not address this allegation, having already found other employer violations.

(in addition to the contractual extension of one year).

(4) Various options for current HCFO employees:

(A) Using a joint labor/management subcommittee to determine the qualified labor pool from which each retained bargaining unit position at HCFO Kunia would be selected;

(B) Allowing employees who left prior to the scheduled layoff date to receive full separation benefits; and

(C) Permitting senior employees to elect severance, bumping, or transfer into the new positions with two-week familiarization period.

(5) Rules governing the transfer to the merged unit:

(A) Retention of all HCFO bargaining unit job classifications at HCFO Kunia, with laid-off HCFO employees retaining seniority rights;

(B) Giving laid-off HCFO employees an option to suspend severance and retain recall rights for future vacancies at the merged unit; and

(C) Transferring five HCFO employees into KFF, and creating forty upgraded [6] regular KFF positions over four years.

The parties caucused, and the Del Monte Committee presented its initial position and responded to the Union proposal. Negotiations continued at the June 12, 2003 session, where the Union began by asking for a complete response to its prior information requests and presented a revised proposal.

At the June 17, 2003 session, Del Monte presented a package proposal, which the Union rejected. However, after further negotiations, several tentative agreements were reached, subject to an agreement on all matters. The parties agreed to: (1) an addition-al one-half day of severance benefits for each year of service for laid-off workers; (2) various pay-out options for severance benefits; (3) an additional two months of medical coverage for affected employees; and (4) an additional month of housing for each year of service. Furthermore, with respect to the HCFO employee options after the closure, the parties agreed to: (5) use of a joint labor/management subcommittee to identify the labor pool from which HCFO positions would be allocated; [7] (6) termination benefits for employees who left the company prior to the scheduled layoff date; and (7) the right of senior employees to accept a job, elect severance, bump, or transfer to the new position with a familiarization period.[8] In exchange for these proposals, Del Monte sought the Union's agreement to: (1) the transfer of two KFF concentrate employees to the HCFO unit; (2) the transfer of three HCFO mechanics to the Plantation unit; and (3) the withdrawal of the unfair labor practice charges. The Union was willing to withdraw the pending charge with the HLRB if settlement was reached. However, the Union was not willing to make the other concessions unless Del Monte agreed to the Union's upgrade proposal.

### 4. The Final Bargaining Session and the June 21 Letter

At the June 21, 2003 bargaining session, Del Monte gave the Union a written letter setting forth the company's final offer. The letter offered two basic alternatives: (1) that the Union agree to the tentative agreements that had been reached as of June 17, 2003, including the transfer of two KFF positions into the HCFO bargaining unit, and adding the condition that the Union withdraw its pending unfair labor practice charges; or (2) that all HCFO employees be terminated,[9]

---

6. An upgrade under the KFF collective bargaining agreement involves moving an employee from "covered seasonal" status to "regular" status, entitling them to increased benefits under the agreement.

7. The Union had initially proposed that the remaining jobs be determined by seniority. The tentative agreement, however, added qualifications as another criteria, pursuant to Del Monte's request.

8. The parties did not agree, among other things, to the Union's request for recall rights for laid-off employees, or its request for upgrades, which it had reduced to a total of thirty-four from an initial proposal of forty.

9. The majority of HCFO employees were to be laid off as of June 30, 2003, while four employees would be retained until all dismantling work was completed, by July 31, 2003 at the latest.

without any transfer to KFF, and receive only pre-existing termination benefits under the collective bargaining agreement.[10] With respect to this offer, the HLRB made the following findings of fact:

18. On June 21, 2003 DEL MONTE'S committee handed the Union DEL MONTE's final offer that spelled out the consequences if the Union did not agree to the final offer. The first half of the offer reflected the tentative agreements reached as of June 17, 2003 but also required the Union to withdraw the unfair labor practice complaints.

19. Starting on page four of the final offer, DEL MONTE identified the consequences if the Union rejected the offer. If the Union did not accept DEL MONTE's final offer the company planned to terminate all HCFO employees with the exception of a couple of journey employees who would be terminated after the dismantling of the HCFO at Waiakamilo. The terminated HCFO employees would receive only the termination benefits required under the collective bargaining agreement with none of the enhanced benefits discussed in effects bargaining. It was a take-it-or-leave-it proposition. DEL MONTE intended to empty out the bargaining unit absent the Union's acceptance of the offer. DEL MONTE stated it would implement the consequences on July 1, 2003 if the Union did not accept the offer by noon on June 23rd. The Union rejected DEL MONTE's offer as unlawful.

The letter also specified that if the Union did not agree to the proposal, Del Monte intended to create two mechanics positions in the Plantation unit, create two jobs in the KFF unit, temporarily transfer some KFF employees to laborer positions to assist with

duties involving processing operations, and "take other steps necessary to operate the relocated operation" in compliance with applicable contract provisions. Lastly, Del Monte stated that it "remain[ed] willing and able to meet with the ILWU to discuss any further questions or concerns concerning the terms and conditions of affected employees."

### 5. The Aftermath and Subsequent Actions of the Parties

After the Union rejected Del Monte's offer, negotiations were discontinued. During the week of June 23, 2003, all processing operations at Waiakamilo ceased and Del Monte began trial runs in Kunia using HCFO employees selected from the sign up lists. On June 30, 2003, Del Monte proceeded with the downsized HCFO operations. Rather than lay off all HCFO employees, however, Del Monte transferred the fourteen senior-most employees who had signed up for the new job posting to Kunia.[11] The remaining fifty-five HCFO employees were laid off and paid severance benefits as specified in the collective bargaining agreement.

### B. Procedural History

#### 1. The HLRB Proceedings and Decision

As set forth above, the ILWU first filed an unfair labor practice complaint with the HLRB on May 12, 2003, which was later superceded by an amended complaint on June 25, 2003. In its second amended complaint, the Union alleged violations of HRS §§ 377–6(1), (3), (4), (6) and (8). The HLRB held hearings on June 27 and 30, July 1, 11, 22, 23, 29, and 31, 2003.

The HLRB issued its "Findings of Fact, Conclusions of Law, and Order" on March 24, 2004. In a 2–1 decision, the HLRB ruled that Del Monte violated HRS § 377–6(4) for

---

**10.** None of the enhancements discussed in prior bargaining sessions would be included, and severance would be given as a lump-sum payment.

**11.** It is not clear at what point, or for what reason, Del Monte decided not to go through with its complete termination plan as set forth in

the June 21 letter. As of the first day of the HLRB hearing, June 27, 2003, a Del Monte representative still expressed intent to follow through with the total layoff. However, by the following hearing on Monday, June 30, 2003, Del Monte had reversed its stand.

refusing to bargain,[12] as well as HRS § 377–6(1) and HRS § 377–6(3).[13] The HLRB did not address the Union's allegations of failure to provide information and contractual violations, having already found a failure to bargain and discriminatory conduct on the basis of Del Monte's final offer. As such, the HLRB made the following conclusions of law:

3. The Board concludes that the Employer's decision to close the Waiakamilo facility and relocate the bulk of its operations to Sanger was not a mandatory subject of bargaining so that its failure to engage in negotiations or provide information regarding the move did not constitute an unfair labor practice....

....

4. Based on the record, the Board concludes that the conditions imposed on bargaining within the Employer's final offer were "so onerous or unreasonable as to indicate bad faith." The first half of the final offer reflected the tentative agreements reached as of June 17, 2003 and required the Union to withdraw the unfair labor practice complaints. If the Union did not accept the final offer the company planned to terminate all HCFO employees except a few journey employees who would be terminated after the dismantling of HCFO Waiakamilo. The terminated employees would receive only the termination benefits required under the collective bargaining agreement with none of the enhanced benefits discussed in effects bargaining. It was a take-it-or-leave-it proposition which was intended to empty out the bargaining unit absent the Union's acceptance. DEL MONTE stated it would implement the consequences on July 1,

2003 if the union did not accept the offer by noon on June 23rd. The Board concludes therefore that DEL MONTE refused to bargain in good faith with the ILWU and therefore violated HRS § 377–6(4).

....

8. The Board concludes that DEL MONTE violated HRS § 377–6(1) and (3) by its inherently destructive discriminatory act of threatening to terminate all members of the HCFO. The threat was directed against all bargaining unit members. At least for the employees who the Employer had previously intended and subsequently decided to retain, the threat was a result of their participation in the bargaining unit and the exercise of rights via their exclusive representative.

In support of its finding that Del Monte refused to bargain in good faith, in violation of HRS § 377–6(4), the HLRB said the following:

The Employer simply promised to terminate all bargaining unit members on three days' notice unless the Union capitulated to its terms and forfeited its rights to redress. By emptying the HCFO bargaining unit of all of its members the Employer would have satisfied its bargaining obligations by simply destroying the bargaining unit.

This was particularly insidious because DEL MONTE planned to retain the previously promised HCFO jobs and functions at Kunia. It would then create new positions, combined positions doing former HCFO work (boiler/juice operator and packaging machine operator), and then transfer KFF employees to laborer positions to do the rest of the former HCFO

---

12. The HLRB found that the decision to close the Waiakamilo facility was not a mandatory subject of bargaining, and therefore there was no failure to bargain with respect to that decision. This was the sole point on which Chairman Kathleen Racuya–Markrich concurred.

13. HRS § 377–6, entitled "Unfair labor practices of employers," provides in pertinent part that:

It shall be an unfair labor practice for an employer individually or in concert with others:

(1) To interfere with, restrain, or coerce the employer's employees in the exercise of the rights guaranteed in section 377–4;

....

(3) To encourage or discourage membership in any labor organization by discrimination in regard to hiring, tenure, or other terms or conditions of employment.

work. DEL MONTE also planned to post at the plantation the journey positions it had planned to transfer from HCFO and fill accordingly. Any newly hired plantation mechanic would end up performing HCFO work. With no contractual obligation under HCFO, SUZUKI agreed DEL MONTE could freely create these new positions in KFF to do the former HCFO work.

As a "humanitarian" gesture the Employer intended to permit the laid off HCFO members to apply for and receive preference for vacancies at Kunia. If selected for one of the reputed 154 vacancies, a former HCFO member would, however, be hired as an entry level or "seasonal" employee. Such status entitled an employee to only statutorily required rights and benefits, there would be no right to join a bargaining unit, any accrued seniority would be eliminated, there would be no severance benefits, and no rights under any collective bargaining agreement. Up to 30 years of service would be washed away. And the workforce would be comprised of contract day labor.

Ironically, the former HCFO, now seasonal, employees might have applied for whatever of their old jobs had been transferred to Kunia. Upon posting, the now-seasonal employees could have applied for temporary assignment to their newly posted old jobs. If no regularly employed applicant was determined to qualify to be placed in the position, the obviously qualified former HCFO employees would end up doing their old job, except they would be stripped of bargained for benefits or bargaining rights, and at a substantial savings to the Employer. While the Employer claims that such outcomes were not targeted, it also concedes they were, with the accompanying advantages, possible.

The HLRB was not persuaded by Del Monte's four defenses to bad faith bargaining. In response to Del Monte's argument that the layoffs were necessary in order to meet the scheduled transition of remaining HCFO functions to Kunia, the HLRB found

that such layoffs appeared not to have been an operational necessity, because the plan was ultimately withdrawn. Second, the HLRB dismissed Del Monte's argument that it was not responsible for the collapse in negotiations because in and after its final offer the company invited further negotiations, stating the following: "the utility of negotiations with the Union representing a bargaining unit which was to be unilaterally stripped of membership, and therefore bargaining power, escapes the Board." In response to Del Monte's argument that its final offer was not an unlawful condition, but only served to advise the Union of "an alternative that emphasized the comparative advantages of the final package," the HLRB found that "when the 'alternative' is nothing more than a promise to empty the bargaining unit which effectively makes further bargaining impossible, characterizing the threat as a consequence rather than as condition can make no meaningful difference." Lastly, in response to Del Monte's argument that its conduct throughout the course of bargaining prior to the final offer—in particular the uncontested mutual concessions—reflected such indicia of good faith that on the "totality of circumstances" a finding of bad faith was not warranted, the HLRB concluded that "any apparent indicia of good faith that could be inferred by the Employer's concessions or conduct prior to its final offer was rendered illusory by the terms of that offer." [14]

The HLRB issued the following remedial order:

1. DEL MONTE shall cease and desist from the above identified unfair labor practices and resume effects bargaining with the ILWU subject to the following conditions:

 a. All HCFO members laid off as a result of the closing of the Waiakamilo facility shall be awarded the enhanced severance benefits identified in previous negotiations or the cash value thereof;

 b. Any HCFO members transferred or hired into equivalent positions in the KFF or plantation bargaining units

---

**14.** The HLRB further noted that the Employer's "ultimatum not only foreclosed bargaining but included the stripping of previously bargained for benefits."

shall be credited with all seniority and benefits accrued within the HCFO bargaining unit;

c. For any equivalent HCFO job being performed by KFF or Plantation employees, there shall be a new permanent position established within the effected [sic] bargaining unit; and

d. DEL MONTE shall provide the ILWU with a detailed complete list of its current vacancies. Qualified displaced HCFO employees shall have rights of first refusal in the filling of any vacancies. If the duties to be performed are substantially the same as those of the HCFO job from which the employee was laid off, the newly filled position shall be made permanent and the employee afforded the seniority and rights accrued at HCFO.

2. The conditions identified above may be modified or waived by the mutual consent of the parties in bargaining. But unless waived or deferred by mutual consent, DEL MONTE shall implement the above conditions within 45 days of the issuance of this order.

3. Respondents shall immediately post copies of this decision in conspicuous places at work sites where employees of the bargaining unit assemble and congregate, and on the Respondents' website for a period of 60 days from the initial date of posting.

### 2. The Circuit Court Affirms the HLRB Decision

On April 23, 2004, Del Monte filed its notice of appeal to the circuit court.[15] The circuit court affirmed the HLRB's decision, stating in its September 20, 2004 decision:

With respect to the mixed questions of law and fact regarding whether Appellant bargained in bad faith and whether Appellant interfered with or discriminated against the Union in an inherently destructive manner, this Court must give deference to the HLRB's decision, and cannot substitute its own judgment for that of the Agency. Based upon the evidence, the

Court does not conclude that the HLRB's Findings and Conclusions were clearly erroneous.

With respect to the remedy of proving [sic] enhanced separation benefits, based upon H.R.S. Section 377–9(d), the Court does not conclude that the HLRB erred as a matter of law in awarding such benefits. Accordingly, the HLRB's Decision No. 447 is AFFIRMED.

Judgment and Notice of Entry of Judgment was filed on April 1, 2005. On April 29, 2005, Del Monte filed its Notice of Appeal to the Supreme Court.

### II. STANDARDS OF REVIEW

#### A. Secondary Appeal

■ Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [ (1993) ] to the agency's decision.

*Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998) (quoting *Bragg v. State Farm Mutual Auto. Ins.,* 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996)) (alteration in original). HRS § 91–14, entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

---

15. On the same day, both the parties submitted statements of compliance to the HLRB.

(5) Clearly erroneous in view of the reliable, probable, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"[U]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." *In re Hawaiian Elec. Co.*, 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (citing *Outdoor Circle v. Harold K.L. Castle Trust Estate*, 4 Haw.App. 633, 638–39, 675 P.2d 784, 789 (1983)).

### B. *Administrative Agency Conclusions of Law and Findings of Fact*

▮ An agency's conclusions of law are reviewed *de novo, Camara v. Agsalud*, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984), while an agency's factual findings are reviewed for clear error, HRS § 91–14(g)(5). A "[conclusion of law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." *Price v. Zoning Bd. of Appeals of City and County of Honolulu*, 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994).

▮ As a general matter, a finding of fact or a mixed determination of law and fact is clearly erroneous when "(1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made." *In re Water Use Permit Applications*, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000). Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (quoting *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999)).

### C. *Statutory Interpretation*

▮ Statutory interpretation is "a question of law reviewable *de novo.*" *State v. Levi*, 102 Hawai'i 282, 285, 75 P.3d 1173, 1176 (2003) (quoting *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)). This court's statutory construction is guided by established rules:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

*Peterson v. Hawaii Elec. Light Co., Inc.*, 85 Hawai'i 322, 327–28, 944 P.2d 1265, 1270–71 (1997), *superseded on other grounds by* HRS § 269–15.5 (Supp.1999) (block quotation format, brackets, citations, and quotation marks omitted).

▮ In the event of ambiguity in a statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." *Id.* (quoting HRS § 1–15(1) (1993)). Moreover, the courts may resort to extrinsic aids in determining legislative intent, such as legislative history, or the reason and spirit of the law. *See* HRS § 1–15(2) (1993).

### D. *Deference to Discretionary Decisions of Administrative Agencies*

▮ Under HRS 91–14(g)(6), an administrative agency's determinations will not be disturbed unless "[a]rbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Thus, before we can determine whether an agency abused its discretion pursuant to HRS § 91–14(g)(6), we must determine whether the agency determination under review was the type of agency action within the boundaries of the agency's delegated authority. To the extent that the legislature has

authorized an administrative agency to define the parameters of a particular statute, that agency's interpretation should be accorded deference.

Thus, when reviewing an agency's determination, this court has stated:

> The standard of review for administrative agencies ... consists of two parts: first, an analysis of whether the legislature empowered the agency with discretion to make a particular determination; and second, if the agency's determination was within its realm of discretion, whether the agency abused that discretion (or whether the agency's action was otherwise "arbitrary, or capricious, or characterized by ... [a] clearly unwarranted exercise of discretion," HRS § 91–14(g)(6)). If an agency determination is not within its realm of discretion (as defined by the legislature), then the agency's determination is not entitled to the deferential "abuse of discretion" standard of review. If, however, the agency acts within its realm of discretion, then its determination will not be overturned unless the agency has abused its discretion.

*Paul's Electrical Serv., Inc. v. Befitel,* 104 Hawai'i 412, 417, 91 P.3d 494, 499 (2004) (internal citation omitted).

## III. DISCUSSION

**A.** *The Circuit Court Did Not Clearly Err in Affirming the HLRB's Determination that Del Monte Refused to Bargain in Good Faith.*

Del Monte argues that the HLRB's determination that Del Monte refused to bargain in good faith in violation of HRS § 377–6(4) was erroneous because the "totality" of its bargaining conduct demonstrated good faith. Applying the clearly erroneous standard of review, the circuit court affirmed the HLRB's determination that Del Monte had

violated HRS § 377–6(4), deferring to that agency's expertise. As set forth below, we agree with the circuit court's conclusion.

■ HRS § 377–6(4) makes it an unfair labor practice for an employer "[t]o refuse to bargain collectively" with the employees' Union.[16] Whether a party failed to bargain in good faith is a mixed question of fact and law, *NLRB v. Reed & Prince Mfg. Co.,* 205 F.2d 131, 134 (1st Cir.1953); *Bd. of Educ.,* 1 HPERB 275, 285 (1972), as it consists of the application of the legal standard under HRS § 377–6(4) to the factual conduct of the parties. *See Price,* 77 Hawai'i at 172, 883 P.2d at 633 (defining mixed questions of law and fact as conclusions of law that are "dependent upon the facts and circumstances of the particular case").

The HLRB has adopted the following standard to assess whether an employer has met its statutory duty to bargain, drawn from federal labor law principles regarding bargaining in "good faith": "whether the totality of the [employer's] conduct evinces a present intention to find a basis for agreement and a sincere effort to reach a common ground." *Bd. of Educ. (Decision 22),* 6 HLRB 173, 177 (2001) (citing *The Developing Labor Law: The Board, The Courts, and the National Labor Relations Act* 608 (Patrick Hardin et al. eds., 3d ed.1992) [hereinafter *The Developing Labor Law* (3d ed.) ] (citing, *inter alia, NLRB v. Montgomery Ward & Co.,* 133 F.2d 676, 686 (9th Cir.1943))). In addition to this inquiry, which focuses on the totality of the parties' conduct, the HLRB also discusses certain "conditions imposed upon bargaining which [are] 'so onerous or unreasonable as to indicate bad faith.' " (Citing *The Developing Labor Law* (3d ed.), *supra,* at 596–97.) We do not pass on the propriety of the legal standard for HRS § 377–6(4) adopted by the HLRB, which in any case has not been

---

**16.** The Hawaii Employment Relations Act (HERA), which governs collective bargaining among non-public employees within its jurisdiction, provides the following definition of "collective bargaining," which sheds light on the employer's duty to bargain under HRS § 377–6(4):

> "Collective bargaining" is the negotiating by an employer and a majority of the employer's

employees in a collective bargaining unit (or their representatives) concerning representation or terms and conditions of employment of such employees *in a mutually genuine effort to reach an agreement with reference to the subject under negotiation.*

HRS § 377–1(5) (1993) (emphasis added).

raised by the parties.[17]

Del Monte contends that the HLRB focused unduly on Del Monte's June 21 letter in making its bad faith determination, while ignoring the totality of its conduct which Del Monte argues demonstrates its intent to find a basis for agreement. Del Monte further argues that the June 21 letter was misinterpreted by the HLRB, and should not form the basis of a bad faith determination. In support of its argument, Del Monte cites numerous actions it undertook that it argues indicate a good faith desire to reach an agreement, including attending all scheduled meetings, exchanging proposals, and reaching agreement on numerous proposals. Del Monte also defends its final offer issued in the June 21 letter as "hard-bargaining" undertaken in good faith, and as an effort to promote rather than to thwart agreement.

In rebuttal, the Union reiterates much of the evidentiary basis on which the HLRB relied to reach its conclusion, and disputes Del Monte's characterization of its bargaining activity. In particular, the Union points to the HLRB's determination that the final offer issued by Del Monte in the June 21 letter was a "take-it-or-leave-it" proposition that would empty out the HCFO bargaining unit if the Union did not accept the offer. The Union also raises the fact that the HLRB determined Del Monte's defenses— such as its claim that the proposed layoffs were necessary to meet transition deadlines and that its final offer invited further negotiations—to be without merit. Lastly, the Union supplies various pieces of evidence aimed at rebutting Del Monte's claim that its prior conduct reflected "such indicia of good faith"

that a finding of bad faith on the "totality of the circumstances" was not warranted.

■■■■ As stated above, whether an employer has bargained in good faith presents a mixed question of law and fact reviewed under the clearly erroneous standard. Even though there is evidence in the record of discrete actions by Del Monte suggestive of good faith, the HLRB's determination of the "totality" is not a counting game of good and bad acts, and its expertise in labor relations entitle the HLRB to judicial deference in this area. *See Gov't Employees Ins. Co. v. Hyman*, 90 Hawai'i 1, 5, 975 P.2d 211, 215 (1999) ("[J]udicial deference to agency expertise is a guiding precept where the interpretation and application of broad or ambiguous statutory language by an administrative tribunal are the subject of review."). More to the point, and in harmony with the circuit court's decision, the scope of review under the clearly erroneous standard is limited to (1) determining whether there is substantial evidence in the record to support the ruling and (2) if there is such evidence, determining whether the record nevertheless leaves the court with the definite and firm conviction that a mistake has been made. *In re Water Use Permit Applications*, 94 Hawai'i at 119, 9 P.3d at 431; *see also Protect Ala Wai Skyline v. Land Use and Controls Comm.*, 6 Haw.App. 540, 547, 735 P.2d 950, 955 (1987) ("[T]he law does not require that all the evidence put before an administrative agency must support the agency's findings." (Citations omitted.)). "Substantial evidence" is credible evidence of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. *In re*

17. Neither party has contested the legal standard for good faith applied by the HLRB, at the circuit court or in this appeal. On the contrary, Del Monte states that "[i]t is undisputed that the test for good faith bargaining is whether the 'totality' of the party's conduct demonstrates a present intention to find a basis for agreement," which test the HLRB applied, and cites approvingly prior HLRB case law discussing that standard.

In any event, the adoption of this standard is a permissible interpretation of the HERA by the HLRB, whose responsibility it is to administer that Act. *See* HRS § 377–2 (1993); HRS § 26–20 (1993). Determining whether bargaining parties exhibited a "mutually genuine effort to reach an

agreement with reference to the subject under negotiation," HRS § 377–1(5), is by its nature an inquiry where hard-and-fast rules do not apply. In this context, this court will observe the "well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous." *Brown v. Thompson*, 91 Hawai'i 1, 18, 979 P.2d 586, 603 (1999) (quoting *Keliipuleole v. Wilson*, 85 Hawai'i 217, 226, 941 P.2d 300, 309 (1997)).

*Water Use Permit Applications*, 94 Hawai'i at 119, 9 P.3d at 431.

■ The HLRB's ruling that Del Monte did not meet its bargaining obligation mandated by HRS § 377–6(4) was supported by credible evidence in the record. Finding of Fact No. 19 discusses Del Monte's final offer which the HLRB found to be a "take-it-or-leave-it" proposition that was "intended to empty out the bargaining unit absent the Union's acceptance of the offer." The letter, which was received on June 21, 2003, gave the Union until June 23 to accept the offer, or face the consequences on July 1, 2003. The letter required the Union to withdraw the unfair labor practice complaints if it was to accept the tentative agreements offered in the first half of the letter. Following rejection of that offer, negotiations were discontinued.[18] These elements of Del Monte's final offer, as well as the context of the negotiations, are sufficient evidence upon which the HLRB may have concluded that Del Monte did not bargain in good faith.

The HLRB also found that Del Monte's actions were "particularly insidious," in that they would allow the company to create new positions which combined former HCFO work in the KFF facility, making it possible to employ qualified former HCFO employees in similar positions "who would be stripped of bargained for benefits or bargaining rights." Lastly, the HLRB rejected Del Monte's various defenses of its actions, finding that: (1) the proposed total layoffs were not an operational necessity; (2) Del Monte's ostensible invitation of further negotiations was of no use to the Union given the circumstances; (3) the final offer "effectively ma[de] future bargaining impossible" rather than presenting a "lawful alternative"; and (4) Del Monte's final offer "rendered illusory" the

apparent good faith of its prior bargaining conduct.

While Del Monte disputes these characterizations, it has not shown them to be in clear error. On the contrary, the HLRB's uncontested findings of fact provide substantial evidence that Del Monte did not bargain in good faith. Del Monte contests in particular the weight that the HLRB placed on the "final offer" issued in Del Monte's June 21 letter. However, the HLRB may, within its expertise, determine that this letter was "so onerous or unreasonable" as to tip the scales towards a bad faith determination, despite the employer's other bargaining conduct.[19] This determination is not clearly erroneous, and this court is not in the position to second-guess the agency's close reading of the complex relationship between Del Monte and the ILWU local. *See Dole Hawai'i Division–Castle & Cooke, Inc. v. Ramil*, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990) ("[T]he court should not substitute its own judgment for that of the agency." (Citation omitted.)).

B. *The Circuit Court Committed an Error of Law in Affirming the HLRB's Determination that Del Monte Violated HRS § 377–6(3), But Did Not Clearly Err in Affirming the Violation of HRS § 377–6(1).*

Del Monte argues that the HLRB's determination that Del Monte violated both HRS §§ 377–6(1) and (3) was an error of law and/or clearly erroneous because its final offer in the June 21 letter was not "inherently destructive" conduct. Specifically Del Monte argues that its conduct was not "inherently destructive" because it (1) did not have a visible and continuing impact and (2) had a legitimate and short-term goal of expediting agreement.[20] However, the circuit court af-

---

**18.** Although Del Monte recited, in its June 21 letter, its willingness to "meet with the ILWU to discuss any further questions or concerns concerning the terms and conditions of affected employees," the HLRB found that this offer had little value under these circumstances.

**19.** As noted, the HLRB found that this letter rendered "illusory" any prior indicia of good faith.

**20.** In its brief, Del Monte focuses on the requirements for "inherently destructive" conduct. Because the "inherently destructive" label has legal meaning for a charge of discrimination under HRS § 377–6(3) and not for a charge of "interference, restraint, or coercion" under HRS § 377–6(1), Del Monte fails to directly address the legal standard for the latter charge. *See Corrie Corp. v. NLRB*, 375 F.2d 149, 152 (4th Cir.1967) (providing standard used for HRS § 377–6(1) charge, as "reasonable tendency in

firmed the HLRB's determination that Del Monte had violated HRS §§ 377–6(1) and (3), applying the clearly erroneous standard of review and deferring to the agency's expertise. As set forth below, we agree with the circuit court's conclusion with respect to the HRS § 377–6(1) charge but disagree with its conclusions regarding the HRS § 377–6(3) charge.

1. **The HLRB's Determination that Del Monte Violated HRS § 377–6(3) Through "Inherently Destructive" Acts Was an Error of Law Because Del Monte Did Not "discriminat[e] in regard to hiring, tenure, or other terms or conditions of employment."**

The HLRB concluded that Del Monte's conduct was "inherently destructive" of employee rights, in violation of HRS § 377–6(3), focusing on the company's final offer contained in the June 21 letter. The HLRB described the violation as Del Monte's "discriminatory act of threatening to terminate all members of the HCFO bargaining unit and eliminate their positions," [21] which it categorized as "inherently destructive." [22]

Under HRS § 377–6(3), it is an unfair labor practice for an employer "[t]o encourage or discourage membership in any labor organization by discrimination in regard to hiring, tenure, or other terms or conditions of employment." In determining whether employer conduct is discriminatory in violation of HRS § 377–6(3), the HLRB has followed National Labor Relations Board (NLRB) and United States Supreme Court interpretation of analogous federal labor law. *See International Longshore and Warehouse Union, Local 142*, 6 HLRB 194, 198 (2001) (citing *Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792). The key element of Section 377–6(3) is "discrimination" by the employer.[23] As the NLRB has put it, "[i]n the law of labor relations, the term 'discrimination' most often refers to inequality of treatment based upon discriminatory employment practices on the part of employers to discourage employees' organizational activities for collective-bargaining purposes." *Walnut Creek Hosp.*, 208 N.L.R.B. 656 (1974). Employment practices that discriminate in this fashion usually take the form of discharge, refusal to hire, or lesser forms of discipline.[24]

---

the totality of the circumstances to intimidate"). However, to the extent that Del Monte's factual and legal arguments with respect to the HRS § 377–6(3) charge also bear on the HRS § 377–6(1) charge, we have considered its arguments to apply to both claims.

21. The HLRB elaborated as follows:
The threat was directed against all bargaining unit members. At least for the employees who the Employer had previously intended and subsequently decided to retain, the threat was a result of their participation in the bargaining unit and the exercise of rights via their exclusive representative.

22. In *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the United States Supreme Court classified discriminatory employer conduct that adversely affects employee rights as either "inherently destructive" or "comparatively slight." *Great Dane Trailers, Inc.*, 388 U.S. at 34, 87 S.Ct. 1792. If the conduct can "reasonably be concluded" to be " 'inherently destructive' of important employee rights, no proof of antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations." *Id.*

23. Interpreting a substantially similar provision of federal law—National Labor Relations Act

(NLRA) Section 8(a)(3)—the United States Supreme Court said the following:

The language of § 8(a)(3) is not ambiguous. The unfair labor practice is for an employer to encourage or discourage membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; *only such as is accomplished by discrimination is prohibited.*
*Radio Officers' Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 42–43, 74 S.Ct. 323, 98 L.Ed. 455 (1954) (emphasis added). We have adopted this analysis with respect to HRS § 89–13(a)(3), which is nearly identical to HRS § 377–6(3) but governs public rather than private sector labor relations. *See Hawaii State Teachers Ass'n v. Hawaii Pub. Employment Relations Bd.*, 60 Haw. 361, 364, 590 P.2d 993, 996 (1979) (concluding that "[o]nly interference with a lawful employee activity, or discrimination affecting the employee exercise of a protected right, may be the subject of a prohibited practice charge under the statute").

24. One of the major treatises on federal labor law, in its "specific conduct" subsection of the "employer discrimination" section, has a discussion of the following areas, each of which involves an employment action that alters the terms or conditions of work: "Discharge or Dis-

Therefore, it is clear that "discrimination" requires some employment action or practice that is beyond a mere threat or bargaining proposal.

 Because the HLRB has not identified any employment action by Del Monte that may qualify as "discrimination," its conclusion that the company violated HRS § 377–6(3) is erroneous. While an administrative agency's interpretation and application of a broad or ambiguous statute is generally entitled to deference, *see Gov't Employees Ins. Co.*, 90 Hawai'i at 5, 975 P.2d at 215, this court will not hesitate to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation. *In re Water Use Permit Applications*, 94 Hawai'i at 145, 9 P.3d at 457.

Del Monte's conduct of putting forward a threatening bargaining proposal, while found to violate its duty to bargain in good faith, did not effect any change in the terms or conditions of the Union members' employment, nor involve any discharge or failure to hire Union members.[25] As such, the conduct did not "discriminate," as no employees were treated differently than any others with respect to their employment conditions. Rather, Del Monte's conduct was limited to the realm of bargaining and did not affect terms of employment. While its result may have been to discourage unionism, it did not reach this result by discrimination as to hiring, firing, or the conditions of employment.

Under these circumstances, the HLRB has applied an erroneous definition of "discrimination" to which this court need not defer.[26] For this reason, we hold that the HLRB erred in its determination that Del Monte violated HRS § 377–6(3).

## 2. The HLRB's Determination that Del Monte Violated HRS § 377–6(1) Was Not Clearly Erroneous.

 HRS § 377–6(1) provides that it is an unfair labor practice for an employer "[t]o interfere with, restrain, or coerce the employer's employees in the exercise of the rights guaranteed in section 377–4."[27] In assessing whether such interference has taken place, the HLRB asks "whether the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate." *United Food and Commercial Workers Union*, 4 HLRB 510, 517 (1988) (quoting *Corrie Corp.*, 375 F.2d at 153). Whether the employer "interfere[d]" with employees' exercise of their rights presents a mixed question of fact and law to be reviewed under the clearly erroneous standard. *See Price*, 77 Hawai'i at 172, 883 P.2d at 633 (defining mixed questions of law and fact as conclusions of law that are "dependent upon the

cipline for Union Activity"; "Lockouts"; "Plant Closings"; "Transfer of Work, Replacement and Reinstatement of Economic Strikers"; "Discharge or Discipline of Union Officers"; "Discrimination Against Union Organizers and 'Salts' "; "Discrimination Based on Race or Sex"; and "Discrimination Based on Terms of Collective Bargaining Agreement." *The Developing Labor Law: The Board, The Courts, and the National Labor Relations Act* 241–42 (Patrick Hardin et al. eds., 4th ed.2001) [hereinafter *The Developing Labor Law* (4th ed.)]. The treatise also states that "the question of whether the employer in fact changed the employee's tenure or terms or conditions of employment is rarely if ever disputed." *Id.* at 259–60.

25. While it is conceivable that later actions by Del Monte that resulted in the discharge of numerous Union employees could give rise to a violation of HRS § 377–6(3), that issue was not presented to the HLRB or the circuit court that heard this case, nor stands before this court on appeal.

26. Nor did the ILWU raise a cognizable claim of discrimination in its complaint or subsequent briefs to the HLRB and this court. In its amended Unfair Labor Practice Complaint, and Memorandum of Fact and Law to the HLRB, the Union focused on the threatening nature of the final offer to support its discrimination claim, the basis upon which the HLRB issued its erroneous ruling.

27. HRS § 377–4 provides in relevant part that:

Employees shall have the right of self-organization and the right to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, and such employees shall also have the right to refrain from any and all such activities . . . .

facts and circumstances of the particular case").

The HLRB concluded that Del Monte's conduct, as expressed in the June 21 offer, was threatening to employee rights. The letter offered two scenarios, one of which required that the Union withdraw its unfair labor practice charge as a condition of agreement, the other of which involved layoff without any benefits beyond those already in the collective bargaining agreement. The Union was given three days' notice before Del Monte would implement the total layoff. Ultimately, fourteen HCFO employees were transferred to Kunia. With respect to the final offer, the HLRB found that, "[a]t least for the employees who the Employer had previously intended, and subsequently decided to retain, the threat was a result of their participation in the bargaining unit and exercise of rights via their exclusive representative."[28] Based on the evidence presented, the HLRB's determination that Del Monte's conduct had a reasonable tendency to intimidate employees, in violation of HRS § 377–6(1), was not clearly erroneous.[29]

C. *The Remedy Granted by the HLRB Was Neither in Excess of its Statutory Authority Under HRS § 377–9(d) Nor an Abuse of its Discretionary Power to Craft Remedies for Unfair Labor Practices.*

Del Monte argues that the HLRB exceeded its statutory authority and was in error with respect to its proposed remedy that "all HCFO members laid off as a result of the closing of the Waiakamilo facility shall be awarded enhanced severance benefits identified in previous negotiations or the cash val-

ue thereof." Del Monte's principal argument is that the HLRB, because of limits in its statutory authority to craft remedial orders, may not impose substantive terms of collective bargaining upon the parties, based on United States Supreme Court decisions limiting the remedial powers of the NLRB. With less emphasis, Del Monte appears to argue in the alternative that even if the HLRB had the authority to grant the enhanced severance benefits remedy, it was not justified in doing so. The circuit court ruled that the HLRB had not erred as a matter of law in granting the enhanced severance benefits remedy. For the reasons discussed below, we agree.

1. **As a Matter of Law, the Enhanced Severance Benefits Remedy Did Not Exceed the HLRB's Statutory Authority.**

 a. *The Statute Affords the HLRB Discretion in Crafting Remedial Orders.*

 In order to determine if the severance remedy granted by the HLRB in this case was in violation of law, we must determine the outer bounds of the authority of the HLRB to order remedies for unfair labor practice violations.

 The extent of the HLRB's remedial powers authorized by statute is a question of first impression for this court. In order to determine whether the HLRB's order was within its authority, me must interpret the statute. The proper interpretation of a statute is "a question of law reviewable *de novo.*" *Levi*, 102 Hawai'i at 285, 75 P.3d at 1176 (quoting *Arceo*, 84 Hawai'i at 10, 928 P.2d at 852).

**28.** In a similar vein, the Union, in its answering brief to this court, asserts that Del Monte's final offer sent a message to the remaining employees in the HCFO and the two other bargaining units that further negotiations were futile. Furthermore, the Union submits, "the final ultimatum ... would have adverse impact on [employees'] willingness in the future to engage in concerted activity."

**29.** The HLRB may also have based its conclusion that Del Monte "interfered" with guaranteed employee rights on its determination that Del Monte refused to bargain in good faith, which is a protected employee right. *See* HRS § 377–4

(1993) ("Employees shall have the right ... to bargain collectively through representatives of their own choosing ...."). Moreover, under federal labor law, a derivative violation of the analogous federal provision, NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1) (2000), can be found whenever another unfair labor practice has been committed. *See The Developing Labor Law* (4th ed.), *supra*, at 82 (" '[A] violation by an employer of any of the four subdivisions of Section 8, other than subdivision one, is also a violation of subdivision one.' " (Quoting *1938 NLRB Annual Report* 52 (1938).)).

As in all statutory analysis, we begin with the statutory text. The imposition of remedies by the HLRB under the HERA is governed by HRS § 377-9(d), which discusses how the HLRB disposes of a case after the final hearing.[30] With respect to final orders, that section says the following:

> Final orders may dismiss the complaint or require the person complained of to cease and desist from the unfair labor practices found to have been committed, suspend the person's rights, immunities, privileges, or remedies granted or afforded by this chapter for not more than one year, *and require the person to take such affirmative action, including reinstatement of employees with or without pay, as the board may deem proper.* Any order may further require the person to make reports from time to time showing the extent to which the person has complied with the order.

HRS § 377-9(d) (1993) (emphasis added).

At issue in this case is what limits exist on the HLRB's power to grant orders requiring "affirmative action." The relevant provision states that the final order "may ... require the person to take such affirmative action, including reinstatement of employees with or without pay, *as the board may deem proper.*" *Id.* (emphasis added).

In interpreting the meaning of this provision, we focus first on the language itself and give effect to that language if it is plain and unambiguous. *See Peterson,* 85 Hawai‘i at 327-28, 944 P.2d at 1270-71. Focusing on the relevant provision above, the statute presents no ambiguity. The provision, on its face, grants discretion to the agency in determining the types of actions it will require of employers who have committed unfair labor practices. The words "as the board may deem proper" make this exceedingly clear. *See State v. Kahawai,* 103 Hawai‘i 462, 465, 83 P.3d 725, 728 (2004) ("The term 'may' is generally construed to render optional, permissive, or discretionary the provision in which it is embodied; this is so at least when there is nothing in the wording, sense, or policy of the provision demanding an unusual interpretation." (Quoting *State ex rel. City of Niles v. Bernard,* 53 Ohio St.2d 31, 372 N.E.2d 339, 341 (1978).)). The clause specifying reinstatement "with or without pay" as possible actions that could be brought upon a violating employer does not restrict the discretion of the HLRB in crafting "affirmative action[s]," because that clause is explicitly illustrative rather than exclusive in nature, as made clear by the word "including". *See In re Waikoloa Sanitary Sewer Co., Inc.,* 109 Hawai‘i 263, 125 P.3d 484 (2006) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." (Quoting *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,* 314 U.S. 95, 99-100, 62 S.Ct. 1, 86 L.Ed. 65 (1941).)). Therefore, the clear text shows that the Hawai‘i legislature empowered the HLRB with discretion to determine appropriate remedies for the commission of unfair labor practices.[31] *See Paul's Electrical Serv.,* 104 Hawai‘i at 417, 91 P.3d at 499 (stating that, when this court reviews administrative agency determinations, the

---

**30.** The HLRB is statutorily designated as the administrator of the HERA, HRS Chapter 377. HRS § 377-2 (stating that the HLRB "shall administer the Hawaii employment relations act"); *see also* HRS § 26-20 (1993) ("There shall be within the department of labor and industrial relations a board to be known as the Hawaii labor relations board as provided for in section 89-5, which shall exercise powers and duties in accordance with chapters 89, 377, and 396.").

**31.** Although resort to legislative history is unnecessary where a statute's meaning is plain, *Peterson,* 85 Hawai‘i at 327-28, 944 P.2d at 1270-71, the legislative history in this case counsels no opposing construction. The legislative history of the HERA gives little elucidation of the intention of the legislature. One positive statement, in a report from the Hawai‘i House Judiciary Committee recommending passage of the bill to the Senate, provides that: "The purpose of this bill is to procure the peaceful settlement of disputes between labor and industry." Hse. Stand. Comm. Rep. No. 518, in 1945 House Journal, at 1564. This statement of purpose is in the nature of a general objective. While potentially meaningful in another context, the broad statement provides little guidance to the issue at hand. *Cf.* National Labor Relations Act § 1, 29 U.S.C. § 151 (2000) (includes an extensive statement of policies, such as the aim to promote the flow of commerce and to encourage the friendly adjustment of industrial disputes, which have been used to guide adjudicators in interpreting that Act). There is no contention that the proposed remedy is not a "peaceful settlement."

first step is "an analysis of whether the legislature empowered the agency with discretion to make a particular determination").

b. *The Distinct Language and History of the HERA Make Judicially Constructed Limitations on the Remedial Authority of the NLRA Inapplicable to the HLRB.*

Del Monte argues that the HLRB's authority to grant remedies should be limited by the 1970 United States Supreme Court case *H.K. Porter Co., Inc. v. NLRB,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), which held that the NLRB lacked authority to compel a party to make a bargaining concession or to agree to a proposal. Del Monte also points to legislative history of the NLRA which suggests limitations on the types of remedies permitted.[32] However, due to pertinent differences in the language, structure, and history of the HERA and the NLRA, these authorities cannot dictate the development of Hawai'i law and Del Monte's arguments are inapposite.

Textually, the two statutes contain significant variations in the language used to describe the affirmative remedies that may be ordered by the respective labor boards. As discussed, the HERA specifies that the HLRB may issue final orders which "require the person to take such · affirmative action . . . *as the board may deem proper.*" HRS § 377–9(d)(emphasis added). In contrast, the parallel provision in the NLRA states that the NLRB, when it finds that the Act has been violated, may issue an order requiring the employer "to take such affirmative action including reinstatement of employees with or without back pay, *as will effectuate the policies of this subchapter.*" 29 U.S.C. § 160(c) (2000) (emphasis added). The differing language in these two provisions indicates the different remedial schemes on which they are based. While the NLRA provision places a limiting condition on the affirmative action the NLRB can take ("as will effectuate the policies of this subchapter"), the HERA more clearly leaves the crafting of affirmative remedies to the discretion of the board ("as the board may deem proper"). The lack of a policy section in the HERA further makes clear that the statutory language of the NLRA in 29 U.S.C. § 160(c) ("as will effectuate the policies of this subchapter") cannot be read to apply to the parallel provision in the HERA, and that, as a result, judicial interpretations of the NLRA section should not be used to guide interpretation of HRS § 377–9(d).[33] *See H.K. Porter,* 397 U.S. at 108, 90 S.Ct. 821 ("The Board's remedial powers under § 10 of the Act are broad, *but they are limited to carrying out the policies of the Act itself.*" (Emphasis added.)).

█ The structure of the two laws also differs in significant ways which suggest that the HERA was intended to grant more discretion to its board than under the federal labor law. The NLRA begins with an extensive section entitled "Findings and declarations of policy," which has been used by courts and the NLRB to guide its interpretation of the federal Act. As noted, the HERA lacks such a policy section to guide the HLRB in its administration of the act. *Compare* 29 U.S.C. § 151 (2000)("Findings and declarations of policy") *with* HRS § 377–1 to –15. Secondly, the HERA lacks a section

---

**32.** Del Monte cites the statement of the 1935 United States Senate Committee on Education and Labor when considering passage of the NLRA, that it wished to "dispel any possible false impression that this bill is designed to compel the making of agreements or to permit governmental supervision of their terms." (Citing *H.K. Porter,* 397 U.S. at 104, 90 S.Ct. 821 (quoting S.Rep. No. 74–573, at 12 (1935)).) However, the legislative history of the NLRA cannot be understood to be implicitly incorporated by the 1945 Hawai'i legislature which passed the HERA. *See infra* note 35.

**33.** Although this court has used federal precedent on occasion in the past to guide its interpretation of state labor and employment laws, *see, e.g., Hokama v. Univ. of Hawai'i,* 92 Hawai'i 268, 272 n. 5, 990 P.2d 1150, 1154 n. 5 (1999) (consulting federal precedent to aid interpretation of public employment laws under HRS § 89), such consultation is solely to aid interpretation and only makes sense where the statutory language is the same or similar in all relevant respects. *See Crosby v. State Dep't Of Budget & Finance,* 76 Hawai'i 332, 339 n. 9, 876 P.2d 1300, 1307 n. 9 (1994) ("In ruling on state law, this court may look for guidance to federal case law interpreting *similar* provisions." (Emphasis added.)).

equivalent to NLRA § 8(d), 29 U.S.C. § 158(d) (2000), upon which the United States Supreme Court relied extensively in *H.K. Porter* to conclude that the NLRB lacked power to compel a bargaining term, in that case a dues check-off provision. 397 U.S. at 107–08, 90 S.Ct. 821. NLRA § 8(d) explicitly states that the collective bargaining obligation "does not compel either party to agree to a proposal or require the making of a concession." [34] 29 U.S.C. § 158(d). These structural differences reinforce the different natures of the remedial authority granted to the respective boards, and the inapplicability of the *H.K. Porter* decision to Hawai'i state law.[35]

Therefore, based on the plain meaning of the HERA, it is clear that the legislature has granted discretion to the HLRB in crafting remedial orders when an employer has committed an unfair labor practice. Thus, to determine whether the HLRB remedy was proper, we must determine whether the agency abused its discretion.

## 2. The HLRB Did Not Abuse its Discretion by Ordering the Enhanced Severance Benefits Remedy.

■ Having found that the legislature empowered the HLRB with discretion in ordering affirmative remedies, we must determine whether the HLRB's remedy in this case, granting enhanced severance benefits to laid-off HCFO employees, was an abuse of that discretion.[36] *See Paul's Electrical Serv.,* 104 Hawai'i at 417, 91 P.3d at 499.

As this court has discussed, discretion "is a flexible concept":

A strong showing is required to establish an abuse, and each case must be decid-

---

**34.** The nearest equivalent to this section in the HERA comes in the definition section, but does not explicitly or implicitly limit the remedies the HLRB may grant:

"Collective bargaining" is the negotiating by an employer and a majority of the employer's employees in a collective bargaining unit (or their representatives) concerning representation or terms and conditions of employment of such employees in a mutually genuine effort to reach an agreement with reference to the subject under negotiation.

HRS § 377–1(5).

The fact that the HERA does not contain a provision equivalent to NLRA § 8(d) does not by itself mean that the HLRB has the affirmative power to compel parties to agree to specific proposals or to make specific concessions, but does indicate that the legislature did not see fit to apply a specific limitation along these lines. Rather, as discussed, the legislature endowed the HLRB with broad discretion as to its affirmative remedies, and the HLRB's choice of remedy will only be reviewed for abuse of that discretion.

**35.** The structural differences between the HERA and the NLRA are also confirmed by their different origins: the template used to write the HERA was a Wisconsin state law, the Wisconsin Employment Peace Act, codified at Wis. Stat. §§ 111.01–.19 (2006). Wisconsin was one of the first states to pass a state labor relations law in 1937, later amended in 1939. *See* Joseph A. Ranney, *The Rise of Labor & Wisconsin's "Little New Deal",* Wis. Law., May 1995, at 18. The Hawai'i legislature, in 1945, consulted the Wisconsin law in drafting the HERA, 1945 Haw. Sess. L. Act 250, §§ 1–20 at 104–17. *See* Sen. Com. Whole Rep. No. 13, in 1945 Senate Journal, at 530 (reporting on March 22, 1945 hearing

of the committee, where subcommittee was appointed to "go over the bill ... and redraft it along the lines of the Wisconsin bill"). The similarities in the two laws make clear that the Hawai'i law was drawn from the earlier-passed Wisconsin act, rather than the NLRA. *Compare* HRS § 377–9(d) ("Final orders may dismiss the complaint or require the person complained of to cease and desist from the unfair labor practices found to have been committed, suspend the person's rights, immunities, privileges, or remedies granted or afforded by this chapter for not more than one year, and require the person to take such affirmative action, including reinstatement of employees with or without pay, as the board may deem proper.") *with* Wis. Stat. § 111.07(4) (2005) ("Final orders may dismiss the charges or require the person complained of to cease and desist from the unfair labor practices found to have been committed, suspend the person's rights, immunities, privileges or remedies granted or afforded by this subchapter for not more than one year, and require the person to take such affirmative action, including reinstatement of employees with or without pay, as the commission deems proper.") (Such similarities run throughout the two laws). The different statutory text and history of the NLRA and the HERA make clear that judicial construction of the federal law need not govern the state law.

**36.** Because the challenged agency action here was the remedy it issued after determining that the employer had committed an unfair labor practice, it is clear that this action was within its realm of discretion. *See Paul's Electrical Serv.,* 104 Hawai'i at 417, 91 P.3d at 499. The question, discussed below, is whether that discretion was abused.

ed on its own facts. . . . The most commonly repeated definition was first articulated in *State v. Sacoco*[, 45 Haw. 288, 292, 367 P.2d 11, 13 (1961) ]: "[G]enerally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." This definition is appropriate because it highlights the great deference appellate courts generally give to discretionary decisions, and conveys the high burden of arbitrariness or caprice which an appellant must meet to overcome that deference.

*Paul's Electrical Serv.*, 104 Hawai'i at 419, 91 P.3d at 501 (alteration in original) (quoting Michael J. Yoshii, *Appellate Standards of Review in Hawaii*, 7 U. Haw. L.Rev. 273, 292–93 (1985)).

What constitutes an abuse of discretion in the context of an HLRB remedy has not been addressed previously by this court. Rather than creating a general rule to be applied across the board, it suffices to say that the HLRB's remedy in this case was not an abuse of its discretion.

The challenged remedy in this case, of granting enhanced severance benefits that had been tentatively agreed to in prior bargaining, arises in a special and limited context: effects bargaining pending the closing of operations of the HCFO facility and the layoff of the majority of its employees. The closing of a plant and concomitant elimination of the attached bargaining unit constitutes the end of the collective bargaining relationship for the employees to be laid off. These circumstances irrevocably alter the balance of bargaining power between the parties, and the possibility of resolution through negotiations may erode further with the passage of time. For this reason, effects bargaining stands apart from routine negotiations between employer and labor union for a new collective bargaining agreement. As such, the HLRB's substantive remedy does not supply the terms of an ongoing collective bargaining relationship—rather, it is in the nature of a one-time payout calculated to remedy the unfair labor practice that the HLRB found Del Monte had committed. In these circumstances, the HLRB's remedy is not unreasonable or in disregard of principles of law, and will therefore not be overturned as an abuse of discretion.[37] *See Paul's Electrical Serv.*, 104 Hawai'i at 419, 91 P.3d 494.

Although we have modified the circuit court's judgment by holding that Del Monte did not violate HRS § 377–6(3), it is not necessary to modify the remedial order issued by the HLRB. That order, including the challenged remedy of enhanced severance

---

[37]. Even acting under the NLRA—which, as discussed *supra* in section III.C.1.b, does not govern the HLRB's remedial powers—the NLRB has allowed a special remedy in the case of plant closures. *See, e.g.*, *Stevens Pontiac–GMC, Inc. v. Teamsters Automotive Workers Union*, 295 N.L.R.B. 599 (1989) (issuing a bargaining order as well as "a limited backpay requirement designed to *make whole* the employees for losses sustained as a result of the violation, and to recreate in some practicable manner a situation in which the parties' bargaining positions are not entirely devoid of economic consequences for the [company]," where the employer unlawfully refused to bargain about the effects of its decision to close a facility) (emphasis added). In such circumstances, the NLRB applies a remedy first adopted in *Transmarine Corp.*, 170 N.L.R.B. 389 (1968), ordering the employer

> to bargain with the Union, upon request, about the effects on its [employees] of the [company] shutdown, and to pay these employees amounts at the rate of their normal wages when last in the Respondent's employ from 5 days after the date of this Supplemental Decision until the occurrence of the earliest of the following conditions: (1) the date the Respondent bargains for agreement with the Union on those subjects pertaining to the effects of the closing . . .; (2) a bona fide impasse in bargaining; (3) the failure of the Union to request bargaining within 5 days of this Supplemental Decision, or to commence negotiations within 5 days of the Respondent's notice of its desire to bargain with the Union; or (4) the subsequent failure of the Union to bargain in good faith; but in no event shall the sum paid to any of these employees exceed the amount he would have earned as wages [from the date of closure to the time the employee secured equivalent employment or the date the employer offers to bargain]; provided, however, that *in no event shall this sum be less than these employees would have earned for a 2–week period at the rate of their normal wages when last in the Respondent's employ.*
>
> *Id.* at 390 (emphasis added).

benefits,[38] is in the nature of a remedy for Del Monte's violation of its bargaining duty rather than a remedy for a discrimination claim.[39] First of all, the HLRB opinion and decision were primarily focused on the bargaining claim.[40] Furthermore, because the HLRB crafted its remedial order to deal specifically with the effects of the closing of the Waiakamilo facility, and incorporated in that remedy terms that were tentatively agreed to by the parties, it is clear that the HLRB's order was primarily intended to remedy Del Monte's failure to meet its bargaining obligation. Thus, as the HLRB's remedial order was directed towards Del Monte's refusal to bargain in good faith and not on its finding of discrimination under HRS § 377-6(3), there is no reason to alter the HLRB's proposed remedy. Therefore,

and in light of the broad authority of the HLRB to remedy unfair labor practices, the original remedy may stand.

## IV. *CONCLUSION*

Based on the foregoing, we affirm in part and reverse in part the circuit court's April 1, 2005 final judgment.

ACOBA, J., concurred in the result.

---

**38.** The other parts of the remedial order, not challenged by Del Monte, also include the retention of seniority and benefits for HCFO members who are hired or transferred to the Kunia facility, the creation of a new permanent position within the affected bargaining unit for any equivalent HCFO job being performed by KFF or Plantation employees, and granting a right of first refusal to qualified displaced HCFO employees for current vacancies at Del Monte, a list of which Del Monte must provide to the Union.

**39.** The typical remedy for a discrimination claim is backpay and reinstatement under NLRA law. *See The Developing Labor Law* (4th ed.), *supra*, at 2521–22. The HLRB's remedial order does not require Del Monte to pay backpay or reinstate any employees.

**40.** Moreover, to the extent that the HLRB incorrectly applied the law with respect to the discrimination claim, its proposed remedy was not meant to remedy a genuinely discriminatory act. The HLRB misapplied the law by determining that the threatening final offer made out an unfair labor practice under HRS § 377-6(3). Because its theory of the violation was based on a threatening bargaining offer, its remedy can also be understood as directed towards a failure to bargain in good faith. In other words, the proposed remedy does not reflect a concern to eliminate the effects of discrimination, and therefore can stand as a remedy for Del Monte's remaining unfair labor practices under HRS §§ 377-6(4) and (1).