Electronically Filed
Supreme Court
SCWC-29037
22-OCT-2012
10:55 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

DEL MONTE FRESH PRODUCE (HAWAII), INC.;
EDWARD C. LITTLETON; STACIE SASAGAWA; TIM HO;
DIXON SUZUKI; and DEL MONTE FRESH PRODUCE COMPANY,
Petitioners/Appellants-Appellants,

vs.

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION,
LOCAL 142, AFL-CIO,
Respondent/Union/Appellee-Appellee,
and
HAWAII LABOR RELATIONS BOARD,
Respondent/Appellee-Appellee.

NO. SCWC-29037

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 29037; CIVIL NO. 07-1-0708)

OCTOBER 22, 2012

RECKTENWALD, C.J., NAKAYAMA, ACOBA, JJ.,
CIRCUIT JUDGE AHN, IN PLACE OF DUFFY, J., RECUSED,
and CIRCUIT JUDGE ALM, IN PLACE OF MCKENNA, J., RECUSED

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case arises from Del Monte Fresh Produce Company's

2006 decision to cease growing pineapples at its plantation on

Oʻahu.  The company's subsidiary, Del Monte Fresh Produce (Hawaii), Inc., subsequently bargained with the International Longshore and Warehouse Union, Local 142, with regard to the effects of that decision on Del Monte employees in Hawaiʻi.  The Union believed the company was not negotiating in good faith, and on August 21, 2006, it filed a complaint with the Hawaiʻi Labor Relations Board alleging that Del Monte had engaged in unfair labor practices.[1]  Following an evidentiary hearing, the HLRB entered an order on March 21, 2007, which concluded that Del Monte failed to bargain in good faith.[2]

Del Monte appealed, arguing that the Board Chairman displayed an appearance of impropriety during the hearing, and thus, should have been recused and/or disqualified; and that the HLRB created a new test for effects bargaining in contravention of federal labor policy, which led the HLRB to reach an erroneous result.  The Circuit Court of the First Circuit[3] and the Intermediate Court of Appeals affirmed.  Del Monte Fresh Produce (Hawaii), Inc. v. Int'l Longshore and Warehouse Union, Local 142, AFL-CIO (Del Monte II), No. 29037, 2011 WL 5834630, at *5 (App. Nov. 21, 2011) (SDO).

---

[1]    As discussed in Part I.B.1 infra, this opinion refers to the petitioners/appellants-appellants in this case collectively as "Del Monte."

[2]    Then HLRB Board Chairman Brian Nakamura, Board Member Sara Hirakami, and Board Member Emory Springer presided.

[3]    The Honorable Sabrina S. McKenna presided.

In its application, Del Monte raises the following questions:

A.  Did the [HLRB] err by failing to apply the "appearance of impropriety" standard when ruling on [Del Monte's] motion for the HLRB Chairman's recusal or disqualification?

B.  Did the HLRB clearly err in denying [Del Monte's] motion for the HLRB Chairman's recusal or disqualification?

C.  Did the HLRB err in constructing a new test for "effects bargaining" by requiring bargaining on numerous subjects that federal labor policy has rejected as mandatory bargaining subjects?

D.  Did the HLRB clearly err in finding that [Del Monte] failed to engage in good faith effects bargaining?

For the reasons set forth below, we hold that the HLRB did not clearly err in denying Del Monte's motion to disqualify the HLRB Chairman.  We further hold that the HLRB did not clearly err in finding that Del Monte engaged in bad faith bargaining, because there was substantial evidence that the "totality" of Del Monte's conduct did not evince "a present intention to find a basis for agreement and a sincere effort to reach a common ground."  See Del Monte Fresh Produce (Hawaii), Inc. v. Int'l Longshore and Warehouse Union, Local 142, AFL-CIO (Del Monte I), 112 Hawai'i 489, 500, 146 P.3d 1066, 1077 (2006) (citations omitted).  However, to the extent that the HLRB's order could be construed to impose per se requirements for effects bargaining, we also hold that bargaining on all of the subjects identified in the HLRB's order is not required in every effects bargaining accompanying a plant closure.  Accordingly, we affirm the judgment of the ICA.

-3-

## I. Background

The following factual background is taken from the record on appeal.

## A. Announcement of Del Monte Fresh Produce (Hawaii), Inc. Closure

The International Longshore and Warehouse Union, Local 142, AFL-CIO (ILWU or Union) is the bargaining representative for the three bargaining units[4] of Del Monte Fresh Produce (Hawaii), Inc. (DMH). DMH is part of a larger corporation, Del Monte Fresh Produce Company (DM Corporate), which is located in Coral Gables, Florida. DMH and the Union were signatories to three collective bargaining agreements for the three respective units (collectively, "Collective Bargaining Agreement"). The Collective Bargaining Agreement was effective from February 8, 2004 through May 30, 2009.

As of January 2006, DMH was a pineapple plantation located at Kunia on Oʻahu, which employed more than 700 employees. DMH and its local management, Edward Littleton and Stacie Sasagawa, reported to Richard Contreras, the Vice President of Finance and Administration of Del Monte Fresh Produce North America.

On February 1, 2006, Littleton, then General Manager of

_____

[4] The three respective bargaining units include Oʻahu Plantation, Kunia Processing and Packing Operations (Fresh Fruit or KFF), and Kunia Chilled/Frozen Operation (KCFO).

DMH, sent a letter to Fred Galdones, President of the Union, which stated that "effective February 19, 2006, [DMH] will cease its planting of pineapple in Hawaii." The letter further stated that "operations would still continue (at a diminished scale over time) over approximately the next 2 ½ years." On the same day, DMH publicly issued its "Local Company Statement":

> It should be noted that Del Monte is not leaving Hawaii immediately. Pineapple has a crop cycle of three years and the Company's current crop cycle will continue to produce quality fruit through mid-2008. Del Monte expects to continue harvesting and packing pineapple in Hawaii through that time. In fact, the Company expects significant volumes during 2006.
>
> . . . Prior to the close of the Kunia plantation at the end of 2008, Del Monte will work with its employees and union representatives to reduce the impact of this decision. The Company has been discussing measures to help its employees, including notifying other potential employers and potentially transferring the Kunia housing to the current employees/tenants. Del Monte is mindful of the Company's obligations to its employees and the local community, and is committed to making every reasonable effort to lessen the impact on all individuals involved.

In response to these announcements, Galdones sent a letter to Littleton dated February 9, 2006 to request effects bargaining[5] over DMH's closure. Over six months in 2006, the parties met for eight bargaining sessions from February 16 through July 18. During these bargaining sessions the Union was principally represented by Union President Galdones, while DMH was represented by a bargaining committee composed of

---

[5] In labor relations, "effects bargaining" refers to the requirement that an employer bargain over the effects of an operational change, including the effects of a decision to close a plant. 48A Am. Jur. 2d. Labor and Labor Relations § 2345 (2005).

spokesperson Tim Ho, who was from the Hawaiʻi Employers Council, Littleton and Sasagawa.

On February 22, 2006, the Union submitted in writing its proposals regarding the "effects of ceasing planting operations and closure of business." The proposals included three "cost items": "enhanced severance, six months of medical and dental coverage after closure, and protecting the residents of Kunia Camp by providing seed money to retain a housing association." The "non-cost proposals" included administrative items. The parties agreed to form a housing subcommittee to negotiate with respect to Company-provided housing, and on or around February 23, 2006, the Union submitted its housing proposals.

In April 2006, the parties reached certain tentative agreements on the effects of the closure. These tentative agreements related to non-cost items and housing; DMH made no concessions over the other items. On April 12, 2006, DMH proposed a new cost item, a cash "retention bonus" to be paid to fourth year covered seasonal employees, i.e., non-regular employees who had worked for four years, and who remained employed at DMH into 2007. Prior to the filing of the Union's original complaint, the parties last met on July 18, 2006, with no movement by either party regarding cost items.

**B.    HLRB Proceedings**

**1.    Unfair Labor Practice Complaint**

The Union filed its initial administrative unfair labor practice complaint with the HLRB on August 21, 2006, naming as respondents DMH, Littleton, Sasagawa, and Ho.  On December 21, 2006, the Union filed an amended complaint, which named Dixon Suzuki and DM Corporate as additional respondents.[6]  The Union's amended unfair labor practice complaint alleged, inter alia, that Del Monte breached its duty to bargain in good faith in violation of Hawai'i Revised Statutes (HRS) § 377-6(4).[7]  Specifically, the Union alleged that "[o]n and after July 18, 2006[,]" Del Monte "willfully refused to bargain in good faith with the [Union] over the effects of the closure of its operations in Hawaii" by: (1) "their refusal to consider cost proposals that would exceed benefits previously negotiated into the [C]ollective [B]argaining [A]greement[]"; (2) "their claim of impasse"; and (3) their

_____

[6]    For ease of reference, DMH, Littleton, Sasagawa, Ho, Suzuki, and DM Corporate will be referred to collectively here as "Del Monte."

[7]    HRS § 377-6 (1993) provides in pertinent part:

It shall be an unfair labor practice for an employer individually or in concert with others:
. . . .
(4) To refuse to bargain collectively with the representative of a majority of the employer's employees in any collective bargaining unit provided that if the employer has good faith doubt that a union represents a majority of the employees, the employer may file a representation petition for an election and shall not be deemed guilty of refusal to bargain[.]

"fail[ure] to appoint a representative with authority to negotiate and reach agreement on cost items[.]"  Del Monte filed its answer to the amended complaint on January 5, 2007.

In August 2006, DM Corporate announced that it would close KCFO, one of DMH's bargaining units, in September 2006.

On November 13, 2006, DM Corporate informed Sasagawa that it was accelerating the closing of the Kunia plantation to January 22, 2007.  The Union was informed by phone of the accelerated closing date the following day, and by public announcement on November 17, 2006.

On November 16, 2006, Del Monte filed a motion to dismiss and/or for summary judgment, which the HLRB denied after holding a hearing on the motion.

**2.   HLRB Evidentiary Hearings**

Evidentiary hearings were held on November 29, 2006, November 30, 2006, December 12, 2006, December 15, 2006, December 21, 2006, and February 7, 2007.

**a.   Union's Case-in-Chief[8]**

**i.   Timothy Ho**

Ho, President and CEO of Hawaiʻi Employers Council and spokesperson in negotiations for DMH, testified that in 2004, the Union and Del Monte negotiated a new five-year Collective

---

[8]    In addition to the following testimony from Ho, Sasagawa, and Galdones, several DMH employees testified about the pineapple operations.

Bargaining Agreement. Ho acknowledged that the Union had expressed concerns during negotiations that DMH would be closing, and recalled that the Union "wanted to make sure that [DMH] was going to be here for the long haul." According to Ho, DMH gave an affirmative response.

The first time that Ho heard that DMH was "not going to be in Hawaii for a long haul" was "[p]robably a day or two" before DMH announced the decision to the Union, i.e., "late January [2006]." Ho recalled that the reason for the decision to cease plantation operations was that "it was not economically feasible to continue the operations in Hawaii."

Ho acknowledged that on February 9, 2006, the Union sent a letter requesting effects bargaining and information on the timing and reasons for the planned closure. Effects bargaining commenced on February 16, 2006. The Union's counsel then asked Ho about the first effects bargaining meeting and whether he recalled Galdones commenting that "he appreciated that the people in the bargaining there, on the Del Monte side, had their marching orders from corporate." Ho responded, "That sounds correct." Ho further acknowledged that on February 22, 2006, the Union sent its proposal regarding the "effects of ceasing planting operations and closure of business" to DMH.

Ho testified that in February 2006, "the plan was [for DMH] to continue its operations, given the production volumes

that were ongoing. And at the time, the company expected to continue its harvesting operation through 2008." Ho further testified that "[a]t several points in time during the course of our effects bargaining," "things changed a little bit in terms of what the operation was looking like."

### ii. Stacie Sasagawa

Sasagawa had been working for DMH as the Human Resources Manger, but became General Manager in September or October 2006 after Littleton left that position. Sasagwa testified that she was "sure" Littleton assured the Union in 2004 that DMH was "here to stay[.]"

In regard to an April 2006 bargaining session, the Union's counsel asked Sasagawa whether she could recall Ho indicating that DMH "could not provide enhancement; they received marching orders[.]" Sasagawa did not recall Ho making that statement. However, Sasagawa's notes from that meeting indicated, "Remaining items take into consideration what you've said. You know difficult to provide additional economic benefits. Received marching orders, cannot provide enhancements." Sasagawa explained that her understanding with regard to "severance" and "medical benefits," was that DM Corporate was not willing to provide beyond what was agreed upon in the Collective Bargaining Agreement.

After the Union's counsel and Del Monte's counsel

concluded their initial questioning of Sasagawa, the Chairman

asked Sasagawa further questions, and the following exchange

occurred:

> [Chairman]:  In our [Waiakamilo Honolulu
> Chilled/Frozen Operation] hearings, we entertained
> testimony from employees who had been there for 20
> years.  A surprising number of employees who had 20-
> year tenure.
>      A lot of your 500 firees are going to be 20-year
> guys?
>
> [Sasagawa]:  There is a large amount of people with
> many years of service.  As far as specifically over
> 20, I'm not sure.
>
> [Chairman]:  And a lot of testimony we received were
> from people who were extraordinarily proud of doing
> their job to the best of their ability for 20 years.
>      A proportion of your firees are going to be
> those people, yeah?
>
> [Sasagawa]:  Yes.
>
> [Chairman]:  Why didn't the company think that those
> people deserved to remain separate?
>
> [Sasagawa]:  Why did the company not believe –-
>
> [Chairman]:  Why did the company think that those
> people did not deserve enhanced severance, since they
> were being terminated for no fault of their own?
>
> [Sasagawa]:  I'm not sure how to even answer that.
>
> [Chairman]:  The company had a reason for turning down
> the enhanced severance.  Yeah?
>
> [Sasagawa]:  Right.
>
> [Chairman]:  And these are good people, loyal workers
> who have devoted half their life to the company.
>      Why did the company not give them enhanced
> severance?
>
> [Sasagawa]:  I guess that was just their decision to
> not increase their severance beyond the nine days they
> were getting in the contract.
>
> . . . .
>
> [Chairman]:  Now, in January, you are personally going
> to be firing 500 people with no enhanced medical for
> themselves or their families?

-11-

[Sasagawa]:  Yes.

[Chairman]:  You can do that?

[Sasagawa]:  It's a job.  I have to.

The Chairman also questioned Sasagawa about whether employees had relied on Sasagawa's prior representations that the plantation would not close until at least December 2008.  For example, the Chairman asked Sasagawa whether people "bought a car[,]" "had babies[,]" or "got married," "expecting that they would have a job, at least until December of [2008.]"  Sasagawa responded in the affirmative, and the Chairman further asked, "Is that fair?"  Sasagawa responded, "It's not fair."  Del Monte's counsel objected, stating that "we're talking about something emotional or in moral sense that is not at issue here."  The Chairman responded, "[Sasagwa] has responded honestly and sincerely.  I'm not going to strike that.  And it's the bottom line in this case, ethically.  It's not legally."  The Chairman then continued, "Sorry.  I didn't mean to make you cry.  But that is the bottom line."  After a recess was taken, the Chairman stated, "On the record, I'd like to apologize to [] Sasagawa [for] effectively getting emotional in my line of questioning.  I personally appreciate your candor and honesty."  After further questioning of Sasagawa by counsel, the Chairman again apologized, "In real life, when I use the court interrogation tone of voice, my wife slaps me directly.  I'd like to ask you to

-12-

do so if I ever do so again."

### iii. Frederico Galdones

Galdones, President of the Union, testified that he was the spokesperson for the Union when they were negotiating the 2004 Collective Bargaining Agreement. Galdones testified about the Union's proposals for the Collective Bargaining Agreement in 2004, one of which concerned severance. Galdones stated that the Union withdrew that proposal based on DMH's representation in negotiations that it "had been in Hawaii for about 100 years, and [it] would like to be here for another hundred years[.]"

Galdones testified that after the February 2006 announcement that DMH would be closing in 2008, he "met with the Union's Negotiating Committee to discuss the announcement . . . [a]nd we established a set of demands for the discussions." Galdones further testified that prior to doing so, he reviewed previous effects bargaining agreements reached between the Union and other industries, which included "enhancing the benefits beyond what the Collective Bargaining Agreement provided for." With regard to the proposals that the Union submitted to DMH in 2006, Galdones testified that some of the proposals had "economic effects," i.e., the medical and dental extensions, enhanced severance, and housing proposals. With regard to these economic proposals, Galdones testified that during the course of the effects bargaining with DMH, it appeared that the Union was

"[b]argaining against [itself]" because DMH gave no counteroffers.

Galdones testified that during the meetings in February, March, and April 2006, the Union had no reason to believe that 2008 was not a firm closing date. Galdones recalled that at some point in the negotiations, Ho talked about "marching orders" and that he "cannot provide any enhancements[,]" and Galdones understood Ho's comments to mean that "they weren't going to give any more than what the Collective Bargaining Agreement provided for." Galdones asserted that Ho used the word "impasse" in April. However, Galdones disagreed that the parties were at an impasse at the time.

When asked why the Union filed the unfair labor practice complaint against Del Monte, Galdones replied:

> Well, first off, in 2004, we had an indication that they were here for the long haul, and that we would -- and that is the reason why we had established a five-year contract.
> February of 2006, . . . they had indicated to us that they would be closing in 2008. And in the bargaining, when we were in the bargaining, the indication given to us was that the major decision maker was not sitting at the table, but was coming from Coral Gables.
> And that kind of put us at a disadvantage. And that is why we felt that because of the position that we were placed in and how the dynamics of the negotiation was going, we felt that it was not -- we're not treated in accordance to what the labor law provides in negotiation, and we felt it was bargaining in bad faith.

Galdones explained that when the "decision maker on cost items is not present[,]" the person is "so far removed from the emotions" that it makes it "much more difficult" to "reach

-14-

agreements on cost items." Galdones also testified that the September 2006 announcement of the KCFO closure came as a surprise because they were "under the impression that it may be a gradual phaseout, but this was a total closure of KCFO." Galdones also testified about the first time Del Monte made what he considered a cost proposal, which occurred on April 12, 2006 and concerned fourth year covered seasonal employees. According to Galdones, Ho told the Union that the "offer was just good for the day[,]" and Galdones did not find DMH's action "to be conducive to bargaining in good faith."

Galdones testified that the Union amended its August 2006 complaint to include conduct that occurred thereafter, because the Union considered what Del Monte did in November to be "bad-faith bargaining" as the Union "had been given indication by the company that they were going to be harvesting and working through mid 2008." Galdones stated, "instead of from 2006 to 2008, it's now a two-month period." He further stated, "It's difficult for the Union, because it's a moving target." Galdones claimed that the Union was "never forewarned at all" that "there were some problems that might lead towards the closure of the company." Accordingly, Galdones requested that "because of the commitment [DMH] made in February of 2006 that [DMH] would be operating until 2008, that the loss of income that the employees had suffered or will be suffering would be replaced."

### b.    HLRB Hearing on Del Monte's Motion to Disqualify

Del Monte filed a Motion to Disqualify or for Recusal of Board Member (Disqualification Motion), arguing that the Chairman should recuse himself or be disqualified based on his questioning of Sasagawa on the second day of the hearing.

After hearing arguments on the Disqualification Motion on December 15, 2006, the Chairman stated:

> Okay.  Since the recusal is personal to me, I'm going to rule on the [Disqualification] Motion without consultation with my colleagues.
> Since in my tenure as Chairman, witnesses have a frequent tendency to burst into tears, the last two witnesses that did were 300-pound refuse workers with a penchant for violence.  I asked my questions because I don't know the answer, and I really want to know the answer, not because I want to make anybody's case.
> And my position is to represent the public interest on this Board.  And I assume and will continue to assume that a passion for fairness and some compassion is a minimal qualification.
> So your [Disqualification] Motion is denied.

Thereafter, Del Monte's counsel requested that, because Del Monte filed its motion "as recusal or disqualification, that in addition to the Honorable Chairman's ruling on the recusal component, there also be a ruling as to the disqualification issue."  After the HLRB conferred, the Chairman stated, "Pursuant to [Del Monte's] request, the Board has conferred regarding the [Disqualification Motion].  And at least a Board majority supports the Chair's ruling on the matter."

### c.   Del Monte's Case-in-Chief

### i.    Richard Contreras

Richard Contreras, Vice President of Finance and

Administration for Del Monte Fresh Produce North America, testified that he is "responsible for all of the financial aspects of North America[,]" including DMH.

Contreras testified that in 2004, DMH operations were profitable, but that changed in 2005 "because of what was going on in the worldwide market." Contreras sent a letter to Burt Hatton, a representative of Campbell Estate, on June 8, 2004, seeking to extend DMH's lease, which was to expire in December of 2008. Contreras further testified that in 2004, at the time the Collective Bargaining Agreement with the Union went into effect, there was no decision to stop planting or to shut down operations.

Contreras testified that the January 2006 decision to stop planting in Hawaiʻi was based on the fact that 2005 was not a profitable year, DMH's lease was to expire in 2008, and there was increased competition from Latin America. Contreras testified affirmatively that at the time of the January 2006 decision to stop planting, it was his intention to continue the operations through 2008. When asked about his "communications with the Hawaiʻi Committee about the bargaining[,]" Contreras responded that he spoke to Littleton almost "every day," and that it was "very easy" to reach Littleton or Sasagawa. Contreras testified that the DMH Committee had authority to bargain without consulting with corporate on everything but "the three large

dollar items proposals, which were the increased severance, the extended medical benefits, and the housing[.]"  "But on everything else, they had free independence."  Contreras was aware that the committee entered into "numerous tentative agreements with the Union this past year in effects bargaining[,]" and that the committee had "full authority to reach those agreements" "[e]xcept for the three [items] mentioned[.]"  Contreras testified that Del Monte considered the Union's financial proposals, "even though [Del Monte] did not ultimately agree to all the proposals[.]"  Contreras further testified that "the main factor" in their decision was that "the employees were being given about two or three years' notice before they were to be terminated or laid off."  Contreras denied that the DMH committee was told at the start of negotiations that it could not agree to any particular item.

Del Monte's counsel asked Contreras to explain DM Corporate's November 2006 decision to accelerate the shutdown of DMH from 2008 to early 2007.  Contreras responded that, by November 2006, DM Corporate could see that DMH had lost almost five million dollars in 2006 and that the best projection for 2007 was a loss of a million dollars.

On cross-examination, Contreras acknowledged that Del Monte's February 2006 letter to Galdones regarding the initial closure did not "reference the loss of profit in 2005 as a reason

as to why [they] were closing[.]" Contreras admitted that he did not have any discussions with Littleton "before the meetings on effects bargaining as to what [DM Corporate] would be willing to do or not do[,]" and further admitted that the large cost items would have to be approved by corporate.

### ii. Timothy Ho

Ho was called to testify again in Del Monte's case-in-chief. Ho testified that the 2004 Collective Bargaining Agreement "included separation allowance" for employees who might be laid off. Ho testified that he believed the nine-day severance allowance provided for in the Collective Bargaining Agreement was "generous" compared with other contracts that he had seen. Ho denied that the five-year duration in the contract was used to "conceal some kind of existing decision to shut down[.]"

With regard to the 2006 effects bargaining, Ho testified that DMH had "always accommodated the [U]nion's requests for meetings" and that he was "routinely in contact with [] Galdones." Ho further testified that he "believe[d] the [DMH] committee had full authority to negotiate the effects of the close down." Ho stated that the DMH committee "spent a considerable amount of time doing research, considering every one of the company's proposals[,]" and "answer[ing] every proposal that has been made." Ho further stated that he "had full

authority to enter into [the tentative] agreements" with the Union. Del Monte's counsel asked Ho whether it was "accurate" that "the company would not and has not offered anything more than the [Collective Bargaining Agreement,]" to which Ho responded, "No, we had already arrived at some tentative agreements that extend beyond the [C]ollective [B]argaining [A]greement, so I don't see that being correct."

Del Monte's counsel also asked about "impasse" and if Ho could "recall who first said that the parties were at impasse[.]" Ho recalled that Galdones had said it first, but admitted that Ho "may have asked the question in an off-the-record meeting of whether or not we were at impasse on the issues[.]" Ho denied that Del Monte imposed any adverse consequences when the Union did not accept its latest offer.

On cross-examination, the Union's counsel asked whether the 2006 DMH bargaining committee had "full authority on the table to negotiate with the [U]nion a counterproposal for the extended medical benefits, or [whether] that [was] something [they] had to consult and get approval from corporate" for, to which Ho responded, "It would have required approval." Ho admitted that Del Monte did not make any counterproposal to the Union's proposal for enhanced severance or extended medical or dental benefits. On examination by the Chairman, Ho admitted that during the effects bargaining in April he did not have "any

authority in the company to accept or offer anything regarding medical, dental, or severance[,]" and that the same was true for Sasagawa.

### iii. Stacie Sasagawa

Sasagawa was called again to testify. Sasagawa testified that during the 2004 Collective Bargaining Agreement negotiations, there was no indication that DMH would cease planting in the future. Sasagawa denied that Ho or Littleton ever said that the company could not or would not give more than what the Collective Bargaining Agreement provided. Sasagawa recalled that "they had made a statement saying to the effect that they would entertain reasonable requests."

### d.   Testimony Regarding Second Phase of Negotiations

On December 21, 2006, the HLRB concluded the evidentiary hearing. Upon Del Monte's request, however, the HLRB subsequently reopened the hearing to permit testimony on negotiations that occurred in December 2006 and January 2007 ("second phase of negotiations").[9] The second phase of negotiations led to the parties executing a Memorandum of Agreement on January 10, 2007, which ended the effects bargaining. The HLRB heard additional testimony from Ho and

---

[9]    More specifically, on December 5, 2006, at DMH's invitation, the parties held another bargaining session, which marked the start of the second phase of negotiations. The parties met several more times in December 2006. On January 9, 2007, the parties met again, and they mitigated their positions on the various cost items.

Galdones on February 7, 2007.

**3.    HLRB's Findings of Fact, Conclusions of Law, and Order**

On March 21, 2007, the HLRB issued its HLRB Order, in which it referenced this court's decision in Del Monte Fresh Produce (Hawaii), Inc. v. Int'l Longshore and Warehouse Union, Local 142, AFL-CIO (Del Monte I), 112 Hawai'i 489, 146 P.3d 1066 (2006).  The HLRB acknowledged that in Del Monte I, this court applied, but did not expressly adopt, the HLRB's standard for determining whether a violation of the duty to bargain collectively has occurred: "'whether the totality of an employer's conduct evinces a present intention to find a basis for agreement and a sincere effort to reach a common ground.'" (Quoting Del Monte I, 112 Hawai'i at 500, 146 P.3d at 1077).  Additionally, the majority opinion recognized that the "bargaining at issue took place in two discrete phases; one following [Del Monte's] announcement of closure in January 2006 and the other following its announcement of accelerated closure in November of that year."  As to the second phase of negotiations, which were conducted in December 2006, the HLRB found that the negotiations took place in "good faith."  In contrast, the HLRB could not "so conclude with respect to the first phase of negotiations and f[ound] and conclude[d] based on its understanding of the totality of the disclosed circumstances that [Del Monte] failed to bargain in good faith in violation of

HRS § 377-6(4) during this phase."  The Board majority stated:

> In the opinion of the Board majority, rational foundational prerequisites of information must be available, or the subjects of open good faith exchange, in the course of effects bargaining accompanying a closure should at least include [sic]: 1) why the closure is taking place; 2) what, if anything, the Union, employees or the employer could reasonably do to delay, forestall the closure or mitigate the detrimental effects of the closure; 3) the reasons for positions taken in developing, modifying or rejecting offers or counter offers; 4) the resources which might be available to effect compromise; 5) the possible retention, redeployment or liquidation of effected [sic] human or material resources; 6) what is necessary to establish an open and meaningful avenue of communication with decision makers; 7) steps that can be reasonably taken to mitigate the detrimental effects of the pending unemployment to employees, their dependent families or their community; and 8) the precise timing of the closure.

The Board majority then acknowledged that "[e]ach of these elements existed, albeit largely through testimonial disclosure, during the second phase of negotiations[,]" but stated that this could not "be said for the first phase which was marked by a withholding, frustration or unilateral change with respect to each identified element."  The Board majority cited the following as examples of how DMH failed to bargain in good faith during the first phase of negotiations:

> 1.    The Union was advised of only competitive pricing and lease expiration as the initial reasons for closure; profitability and production concerns, much less continuing and exacerbated profitability and production concerns were never transmitted to the Union.
>
> 2.    In the absence of this information and naturally any substantive exchanges between the parties in this regard, the Union had no reason or ability to modify, sweeten or invent new proposals in order to possibly extend the life of the enterprise and its members' jobs.  Any hope or possibility of creative collaboration was lost

within the confines of spreadsheets which were totally unavailable.

3.  [Del Monte's] bargaining representatives dutifully transmitted and costed the Union's costs proposals to Corporate. They also dutifully and steadfastly transmitted Corporate's rejection. But the record is devoid of an instance of the Company's bargaining team ever advising the Union of the reasons for its rejections. Thus, the Union was again left in an informational vacuum. They couldn't obtain the reasons for rejection or reasonably craft a compromise, short of complete capitulations, that might generate movement.

4.  The Union and its members were led to believe, based on [Del Monte's] representation, that employment would be available until December 2008, almost three years after its January 2006 announced closure. The closing date implicitly assured crop retention and cultivation, active and gainful employment until that time, and time to plan, budget and live accordingly. Both the Union and [Del Monte] relied upon this representation in establishing its positions. The sudden unilateral acceleration of closure wiped out these expectations and betrayed these reliance[s].

5.  In its public statement accompanying its first announcement of closure, [Del Monte] committed to: ". . . Del Monte will work with its employees and [U]nion representatives to reduce the impact of this decision. The Company has been discussing measures to help its employees, including notifying other potential employers and potentially transferring Kunia housing to the current employees/tenants. Del Monte is mindful of the Company's obligations to its employees and the local community, and is committed to making every reasonable effort to lessen the impact on all individuals involved." In the course of the first round of bargaining, except for a handful of locally generated well-intended classes and a job fair, virtually none of this happened.

6.  The Board can identify no piece of information more foundationally relevant to effects bargaining accompanying a closure than the date of the closure. That date defines the time for bargaining, the Company's continued need for employees and hence the Union's economic leverage, the time available for employee mitigation of damages, and the time pressure parameters on the taking and establishment of bargaining positions. The closing date is not

necessarily, and was not here argued to be, a
subject of bargaining. But the information
establishes critical and foundational and
operational parameters. Hence [Del Monte]
essentially made disappear the foundation and
therefore substance of the first phase of
bargaining when it accelerated closure.

After listing the aforementioned factors, the Board

majority stated:

The Board does not conclude that any of the
factors discussed above, standing alone is necessarily
dispositive of this issue. But taken together, as
representative of a totality of the circumstances
presented before us the Board must conclude that the
totality of an employer's conduct during the first
phase of bargaining does not evince "a present
intention to find a basis for a basis for [sic]
agreement and a sincere effort [to] reach a common
ground." [Del Monte I, 112 Hawaiʻi at 500, 146 P.3d
at 1077] Instead, its efforts and its conduct
indicates an intention to create an informational
vacuum and temporal box around negotiations which
would induce and require complete capitulation.

In its conclusions of law, the Board majority stated in

relevant part:

Based on the totality of the circumstances presented,
the Board majority must conclude that with respect to
the first phase of bargaining, the totality of the
employer's conduct during the first phase of
bargaining does not evince "a present intention to
find a basis for [] agreement and a sincere effort
[to] reach a common ground." [Del Monte I, 112
Hawaiʻi at 500, 146 P.3d at 1077] Instead, its
efforts and its conduct indicates an intention to
create an informational vacuum and temporal box around
negotiations which would induce and require complete
capitulation. The Union was not provided any
information regarding profitability or production
concerns. The representatives at the bargaining table
either remained silent on the financial condition of
[DMH] or were unaware as to how DMH was financed.
This lack of knowledge or information as to the
financial considerations of the plans for continued
operation precluded meaningful bargaining. Moreover,
upon questioning as to the future of [DMH], the Union
was misled by DMH's assurances that DMH would be in
Hawaii at least until December 2008, and that there
would be no more operational changes in September
2006. Shortly thereafter, [Littleton] left his
General Manager position to [Sasagawa]. The Union was

further misled to believe that it had time to negotiate the impact of the final closure to the majority of employees until 2008.  Accordingly, the Board concludes that [Del Monte] failed or refused to bargain in good faith and thereby committed a prohibited practice in violation of HRS § 377-6(4).

Having found that Del Monte violated its duty to bargain in good faith, the Board majority ordered that:  (1) Del Monte "pay additional severance at the contractually provided rate to all employees terminated as a result of closure for the almost two years between actual closure and December 2008"; and (2) "the parties reopen negotiations with respect to medical insurance and attempt to reach an agreement which supplements and expands their current agreement (two months of medical) with a program that would provide at least 12 months extended coverage to the workers (and their families) who have not as yet acquired insurance."

Board Member Hirakami concurred in part and dissented in part.  Board Member Hirakami concurred with the Board majority's conclusion that Del Monte "failed to bargain collectively in good faith during the first phase of negotiations," but "for different reasons[.]"  Board Member Hirakami focused on the fact that the DMH bargaining committee received "marching orders" from DM Corporate, and accordingly, she concluded that DMH could not meaningfully consider the three cost items proposed by the Union.  Thus, she concurred in the conclusion reached by the Board majority that Del Monte had

failed to bargain in good faith.  Board Member Hirakami

disagreed, however, with the Board majority's discussion of the

eight "rational foundational prerequisites of information which

must be available" in the course of effects bargaining.  She also

disagreed with the majority as to the remedy, and stated that she

would "award four additional months of enhanced medical coverage"

for "a total extended period of six months."

## C.    Circuit Court Proceedings

On April 20, 2007, Del Monte filed its notice of appeal

to the circuit court.  On February 1, 2008, after hearing

arguments and receiving briefing from the parties, the circuit

court filed its Order Affirming HLRB's Decision No. 464 Dated

March 21, 2007.  The circuit court explained:

> With respect to the issue of the recusal and
> disqualification raised by [Del Monte] as to the
> Chair, the [c]ourt finds recusal and/or
> disqualification was not required for the reasons and
> law cited by the Union [].  With respect to the Board
> decision on its merits, the factors considered by the
> Board in finding bad faith bargaining are
> discretionary issues that could be considered by the
> Board in deciding the issue of bad faith bargaining.
> The fact that the Board characterized any of the
> factors as mandatory when they might be discretionary
> is harmless.

On the same day, the circuit court entered judgment in

favor of the Union and the HLRB.

## D.    ICA Appeal

On February 29, 2008, Del Monte timely filed its notice

of appeal to the ICA.  In its opening brief, Del Monte's first

two points of error concerned the HLRB's ruling on Del Monte's

Disqualification Motion, while Del Monte's remaining two points of error concerned the portions of the HLRB Order that addressed bad faith bargaining.  Regarding the Disqualification Motion, Del Monte argued that the HLRB did not apply the proper "appearance of impropriety standard" in ruling on the Disqualification Motion, and erred in denying the Disqualification Motion on the merits.

Regarding the HLRB's finding of bad faith, Del Monte argued that "[t]he HLRB Order is affected by an error of law because it sets forth per se requirements for effects bargaining that are inconsistent with well-settled principles of labor law."[10]  Del Monte also argued that the HLRB erred in finding bad faith.  Accordingly, Del Monte argued that the circuit court erred in affirming the HLRB Order.

In a summary disposition order, the ICA affirmed the circuit court's February 1, 2008 Judgment.  Del Monte II, 2011 WL 5834630, at *5.  As to Del Monte's points of error concerning the HLRB allegedly failing to apply the objective "appearance of impropriety" standard and denying the Disqualification Motion, the ICA stated that the "proper test for disqualifying an administrative adjudicator for bias or impartiality is whether

_____

[10]     Specifically, Del Monte argued that the HLRB Order required employers to bargain about subjects that are not required under federal labor policy.  Del Monte disputed the propriety of the first six "requirements" of the eight imposed by the HLRB.

'the circumstances fairly give rise to an appearance of impro[p]riety and reasonably cast suspicion on [the adjudicator's] impartiality.'" Id. at *1 (citing Sussel v. City and Cnty. of Honolulu Civil Service Comm'n, 71 Haw. 101, 109, 784 P.2d 867, 871 (1989)). The ICA concluded that the "HLRB and the circuit court did not err because [the Chair's] comments did not rise to the level of displaying deep-seated favoritism or antagonism, give rise to an appearance of impropriety, or reasonably cast suspicion on his impartiality." Id. at *2.

The ICA then addressed Del Monte's contention that the HLRB Order erroneously set forth per se requirements for effects bargaining. Id. The ICA stated that the "standard adopted by [the] HLRB to determine whether an employer has met its statutory duty to bargain in good faith is 'whether the totality of the employer's conduct evinces a present intention to find a basis for agreement and a sincere effort to reach a common ground.'" Id. (quoting Del Monte I, 112 Hawai'i at 500, 146 P.3d at 1077). The ICA rejected Del Monte's argument that the HLRB Order set forth per se requirements for effects bargaining, and stated that Del Monte "inaccurate[ly] characteriz[ed] [the] HLRB's holding." Id. at *3. The ICA cited other parts of the HLRB's Order, which showed that the HLRB properly considered "the totality of the circumstances" in determining that Del Monte engaged in bad faith bargaining. Id. (citing Del Monte I, 112 Hawai'i at 500-02, 146

-29-

P.3d at 1077-79).

Lastly, the ICA addressed Del Monte's contention that the HLRB erred in finding that Del Monte bargained in bad faith. Id. The ICA rejected each of Del Monte's arguments regarding the six points of conduct listed in the HLRB Order. Id. at *3-5. The ICA, thus, affirmed the circuit court's judgment. Id. at *5. The ICA subsequently entered its judgment on appeal on December 15, 2011.

Del Monte timely filed its application for writ of certiorari, and the ILWU timely filed its response.

## II. Standards of Review

### A. Motion for Disqualification

The test for disqualifying a board member whose impartiality is challenged is whether the movant has shown "an appearance of impropriety" on the part of the challenged board member. Sussel, 71 Haw. at 109, 784 P.2d at 871 (1989). "[T]he test for disqualification due to the 'appearance of impropriety' is an objective one, based not on the beliefs of the petitioner or [adjudicator], but on the assessment of a reasonable impartial onlooker apprised of all the facts." In re Water Use Permit Applications, 94 Hawai'i 97, 122, 9 P.3d 409, 434 (2000) (quoting State v. Ross, 89 Hawai'i 371, 380, 974 P.2d 11, 20 (1998)).

### B. Administrative Agency Decisions

Review of a decision made by the circuit court upon

its review of an agency's decision is a secondary appeal. The standard of review is one in which [the appellate] court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) (1993) to the agency's decision.

HRS § 91-14, entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).

United Pub. Workers, AFSCME, Local 646, AFL-CIO, v. Hanneman, 106 Hawaiʻi 359, 363, 105 P.3d 236, 240 (2005) (brackets omitted) (quoting Paul's Elec. Serv., Inc. v. Befitel, 104 Hawaiʻi 412, 416, 91 P.3d 494, 498 (2004)).

C.   **Administrative Agency Conclusions of Law and Findings of Fact**

An agency's conclusions of law are reviewed de novo, while an agency's factual findings are reviewed for clear error. A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the

particular case.

> As a general matter, a finding of fact or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Del Monte I, 112 Hawaiʻi at 499, 146 P.3d at 1076 (internal quotation marks, citations, and brackets omitted).

### III. Discussion

We hold that there was no error in (1) the HLRB's denial of Del Monte's Disqualification Motion, and (2) the HLRB's determination that Del Monte bargained in bad faith. As set forth below, there was substantial evidence that the "totality" of Del Monte's conduct did not evince "a present intention to find a basis for agreement and a sincere effort to reach a common ground." See Del Monte I, 112 Hawaiʻi at 500, 146 P.3d at 1077.

However, we further acknowledge that the HLRB Order could erroneously be construed to impose the eight factors listed in the HLRB Order as per se requirements in all effects bargaining cases accompanying a plant closure. Such an interpretation would be inconsistent with the standard for determining whether an employer has breached its obligation to bargain in good faith previously adopted by the HLRB and approved by this court: "whether the totality of the employer's conduct

evinces a present intention to find a basis for agreement and a sincere effort to reach a common ground." Del Monte I, 112 Hawaiʻi at 500, 146 P.3d at 1077 (brackets omitted).  In light of this standard, we clarify that the eight factors may be considered only on a case-by-case basis, depending on whether they are relevant to the facts of a particular case.

**A.   The ICA did not err in affirming the HLRB's ruling on Del Monte's disqualification motion**

In its application, Del Monte argues that the HLRB did not apply the objective "appearance of impropriety" standard, but rather applied a "subjective test."  Del Monte further argues that the ICA failed to address whether the HLRB applied the correct standard.  Finally, Del Monte argues that the HLRB erred in denying its Disqualification Motion, and that the error was prejudicial.  Del Monte's arguments lack merit.

The HLRB did not expressly state whether it was applying the "appearance of impropriety" standard in ruling on Del Monte's Disqualification Motion.  However, the ICA identified and applied the proper objective standard for disqualifying an administrative adjudicator.  The ICA stated: "The proper test for disqualifying an administrative adjudicator for bias or impartiality is whether 'the circumstances fairly give rise to an appearance of impropriety and reasonably cast suspicion on [the adjudicator's] impartiality.'"  Del Monte II, 2011 WL 5834630, at

-33-

*1 (brackets in the original) (quoting Sussel, 71 Haw. at 109, 784 P.2d at 871). The ICA further stated that "'the test for disqualification due to the appearance of impropriety is an objective one, based not on the beliefs of the petitioner or the judge, but on the assessment of a reasonable impartial onlooker apprised of all the facts.'" Id. at *2 (emphasis added) (quoting Office of Disciplinary Counsel v. Au, 107 Hawaiʻi 327, 338, 113 P.3d 203, 214 (2005)). Thus, the ICA properly identified the "objective" standard that Del Monte argues should apply, and as discussed below, the record establishes that under this standard, Del Monte's arguments lack merit.

Del Monte argues that the Chairman displayed an appearance of impropriety by expressing sympathy for the Union members, speculating on their hardship, declaring that the company's actions were not fair, and derisively questioning Sasagawa. Del Monte takes excerpts of the Chairman's comments, such as describing the Union members as "extraordinarily proud" and "good people, loyal workers" and apologizing for "getting emotional" and using his "interrogation tone," and argues that it was "clearly erroneous to find that the HLRB Chairman had not created an 'appearance of impropriety.'"

The Chairman's comments, however, must be viewed in the context in which they arose. The Chairman's questions to Sasagawa came after the Union's counsel and Del Monte's counsel

questioned Sasagawa about Del Monte's representations to the employees regarding the closure date. The Union's counsel also asked Sasagawa about certain cost proposals rejected by Del Monte. Accordingly, the Chairman's questions regarding severance and the employees' reliance on Del Monte's representations regarding the closure date concerned matters that had already been put in issue by the parties. The Chairman clarified on the record, "I asked my questions because I don't know the answer, and I really want to know the answer, not because I want to make anybody's case." Viewing the Chairman's comments from the point of view of "a reasonable impartial onlooker apprised of all the facts[,]" Au, 107 Hawai'i at 338, 113 P.3d at 214, the Chairman's comments "did not rise to the level of displaying deep-seated favoritism or antagonism, give rise to an appearance of impropriety, or reasonably cast suspicion on his impartiality." Del Monte II, 2011 WL 5834630, at *2. Thus, even assuming arguendo the HLRB applied the wrong standard, the error was harmless. Accordingly, the ICA and the circuit court properly affirmed the HLRB's ruling with regard to Del Monte's Disqualification Motion.

**B. The circuit court correctly affirmed the HLRB's determination that Del Monte failed to bargain in good faith during the first phase of negotiations**

For the reasons set forth below, the circuit court correctly affirmed the HLRB's decision that Del Monte bargained

in bad faith during the first phase of negotiations.

HRS § 91-14(g) concerns "Judicial review of contested cases," and provides in relevant part:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> . . .
> (4)   Affected by other error of law[.]

(Emphasis added).

In addition, this court can affirm the decision of a lower tribunal on any ground appearing in the record.  Nihi Lewa, Inc. v. Dep't of Budget and Fiscal Servs., 103 Hawaiʻi 163, 168, 80 P.3d 984, 989 (2003) ("Where the decision below is correct it must be affirmed by the appellate court though the lower tribunal gave a wrong reason for its action.") (citation omitted).  Here, the record established that Del Monte bargained in bad faith during the first phase of negotiations.  The Board majority's FOFs support the conclusion that the "totality" of Del Monte's conduct did not "evince[] a present intention to find a basis for agreement and a sincere effort to reach a common ground."  Del Monte I, 112 Hawaiʻi at 500, 146 P.3d at 1077 (citation omitted).  Accordingly, Del Monte's "substantial rights" were not prejudiced by the Board's decision.  See 91-14(g).

When this court examined the issue of bad faith bargaining in Del Monte I, this court stated that:

> [W]hether an employer has bargained in good faith presents a mixed question of law and fact reviewed under the clearly erroneous standard. Even though there is evidence in the record of discrete actions by Del Monte suggestive of good faith, the HLRB's determination of the "totality" is not a counting game of good and bad acts, and its expertise in labor relations entitle the HLRB to judicial deference in this area.

Id. at 501, 146 P.3d at 1078 (emphasis added).

This court further stated that the "clearly erroneous standard" is limited to "(1) determining whether there is substantial evidence in the record to support the ruling and (2) if there is such evidence, determining whether the record nevertheless leaves the court with the definite and firm conviction that a mistake has been made." Id.

Here, the HLRB's ruling that Del Monte did not meet its bargaining obligation under HRS § 377-6(4) was supported by credible evidence in the record. Effects bargaining requires, inter alia, that an employer "meet with the union, provide information necessary to the union's understanding of the problem, and in good faith consider any proposals the union advances." First Nat'l Maint. Corp. v. N.L.R.B., 452 U.S. 666, 679 n.17 (1981). "The requirement of conferring in good faith involves more than just meeting, more than just sterile or repetitive discussion of formalities or differences between management and the union, and more than formal replies that, in effect, constitute a refusal to deal with the union." C.C. Borklund, Good Faith in Collective Bargaining, 25 Am. Jur. Proof

of Facts 2d. § 333:6 (1981). "[T]he offering of a proposal that is predictably unacceptable, coupled with an inflexible attitude on major issues and no proposal of reasonable alternatives, has been condemned as violative of the good faith obligation." 1 The Developing Labor Law: The Board, The Courts, and the National Labor Relations Act 867 (John E. Higgins, Jr. et al. eds., 5th ed. 2006) (footnote omitted).

With regard to Del Monte's consideration of the Union's proposals in the instant case, the Board majority's FOF No. 18 stated:

> At the first meeting, the Union presented its proposals. These included three cost items: enhanced severance, six months of medical and dental coverage after closure, and protecting the residents of Kunia Camp by providing seed money to retain a housing association. The Union also presented numerous, mostly administrative non-cost proposals. At the onset, [Ho] advised the Union that the Company's committee had "received their marching orders" and that nothing would be negotiated beyond the scope of the [C]ollective [B]argaining [A]greement in force.

Because the DMH bargaining committee was given "marching orders" from DM Corporate to deny enhancements beyond the Collective Bargaining Agreement as to the three cost items, the Union's cost proposals could not be considered in a meaningful way. Any costing of the Union's three proposals would be futile in the face of such "marching orders," and in light of DMH's understanding that "nothing would be negotiated beyond the scope of the [C]ollective [B]argaining [A]greement in force." Moreover, this FOF was supported by credible evidence in the

record.  Sasagawa's notes from one of the meetings referenced that it would be difficult for DMH to "provide additional economic benefits" because it received "marching orders."  When questioned about these notes, Sasagawa explained that with regard to "severance" and "medical benefits," her understanding was that DM Corporate was not willing to provide anything beyond what was agreed upon in the Collective Bargaining Agreement.

In addition, the Board majority found that on April 12, 2006, DMH proposed a new cost item, a cash "retention bonus" to be paid to fourth year covered seasonal employees who remained employed at DMH into 2007.  The record indicates that this offer was available to the Union for only one day, even though Galdones requested more time to discuss the proposal with the Union.  This type of "take-it-or-leave-it" cost proposal, under the circumstances presented here, is inconsistent with an employer's duty to bargain in good faith, as previously recognized by the HLRB and this court.  See Del Monte I, 112 Hawaiʻi at 502, 146 P.3d at 1079 (pointing to a "take-it-or-leave-it" proposition as part of the "evidence upon which the HLRB may have concluded that Del Monte did not bargain in good faith").

In sum, the Board majority made specific findings, based on credible evidence in the record, which supported the conclusion that Del Monte did not bargain in good faith during the first phase of negotiations.  Thus, the totality of Del

Monte's conduct did not "evince[] a present intention to find a basis for agreement and a sincere effort to reach a common ground." Del Monte I, 112 Hawaiʻi at 500, 146 P.3d at 1077. Although this reasoning may differ from the Board majority's discussion, the Board majority's decision does not require reversal. The circuit court affirmed the Board majority's FOFs, and the reasons stated herein for affirming the circuit court's and ICA's judgments are supported by specific findings in the HLRB Order. Cf. Nakamine v. Bd. of Trs. of the Emps. Ret. Sys., 65 Haw. 251, 255, 649 P.2d 1162, 1165 (1982) (reversing the circuit court's order and remanding for further proceedings because the circuit court failed to make specific findings as to what procedural irregularities occurred in the administrative agency proceedings and whether such errors prejudiced the claimant's substantial rights); see also Borklund at § 333:23 (1981) ("In an enforcement proceeding, the court can sustain an ultimate conclusion of lack of good faith without sustaining the Board on each and every one of its subsidiary findings of fact; nor need the court agree as to every incident specially emphasized in the Board's decision as indicating lack of good faith.") (footnote omitted).

## C.  The eight factors identified in the HLRB Order are not per se requirements in every effects bargaining case

Del Monte argues that the HLRB erred by creating a new

test for effects bargaining in contravention of federal labor policy. Del Monte argues that certain factors listed in the HLRB Order are not mandatory bargaining subjects under federal labor law, but that the HLRB Order "effectively compels employers to bargain about" these subjects.[11] Del Monte further argues that it was "erroneous for the ICA to state that the HLRB's new requirements are lawful because they are only a part of the 'totality of circumstances.'" In light of our holding that the HLRB did not err in concluding that Del Monte bargained in bad faith during the first phase of negotiations, we need not address this argument for purposes of this appeal. However, we recognize that an employer "must have some degree of certainty beforehand as to when it may proceed to reach decisions without fear of later evaluations labeling its conduct an unfair labor practice." First Nat'l Maint. Corp., 452 U.S. at 678-79. Accordingly, since the HLRB Order could be read as imposing per se requirements, we consider whether all eight factors identified in the HLRB Order

_____

[11] Del Monte specifically challenges the following six factors: (1) "why the closure is taking place"; (2) "[how] to delay [or] forestall the closure"; (3) "reasons for positions taken in developing, modifying or rejecting offers [or] counter offers"; (4) resources which might be available to effect compromise"; (5) "possible retention, redeployment, or liquidation of effected [sic] human or material resources"; and (6) "what is necessary to establish an open and meaningful avenue of communication with decision makers[.]" (Some brackets in original and some added).

Del Monte acknowledges that the following two factors are recognized components of effects bargaining: (1) "steps that can be reasonably taken to mitigate the detrimental effects of the pending unemployment to employees, their dependent families, or their community"; and (2) "the precise timing of the closure." It would appear that those factors would be relevant in most, if not all, cases.

are mandatory subjects of disclosure and negotiation in every effects bargaining case.  We conclude that they are not, since such an approach would be inconsistent with the case-by-case approach we adopted in Del Monte I.  See Del Monte I, 112 Hawaiʻi at 501 n.17, 146 P.3d at 1078 n.17 ("Determining whether bargaining parties exhibited a 'mutually genuine effort to reach an agreement with reference to the subject under negotiation,' HRS § 377-1(5), is by its nature an inquiry where hard-and-fast rules do not apply.").

HRS § 377-6(4) makes it an unfair labor practice for an employer "[t]o refuse to bargain collectively" with the employees' collective bargaining representative.  In addition, "Regardless of whether an employer is obligated to bargain with the union over a decision involving an operational change, the employer must bargain over the effects of the change[,]" i.e., engage in "effects bargaining."  48A Am. Jur. 2d. Labor and Labor Relations § 2345 (2005) (emphasis added); see also Providence Hosp. v. N.L.R.B., 93 F.3d 1012, 1018 (1st Cir. 1996) (noting that "unions generally enjoy the right to bargain over the effects of decisions which are not themselves mandatory subjects of collective bargaining").  Under HERA, "collective bargaining" is defined as "the negotiating by an employer and a majority of the employer's employees in a collective bargaining unit (or their representatives) concerning representation or terms and

conditions of employment of such employees in a <u>mutually genuine effort to reach an agreement</u> with reference to the subject under negotiation." HRS § 377-1(5) (1993) (emphasis added). In <u>Del Monte I</u>, this court approved the following standard to assess whether an employer has met its statutory duty to bargain in good faith: "whether the totality of the [employer's] conduct evinces a present intention to find a basis for agreement and a sincere effort to reach a common ground." 112 Hawaiʻi at 500-01, 501 n.17, 146 P.3d at 1077-78, 1087 n.17 (brackets in original) (quoting <u>Bd. of Educ.</u>, 6 HLRB 173, 177 (2001)).

Here, the HLRB Order stated:

> In the opinion of the Board majority, <u>rational foundational prerequisites of information which must be available, or the subjects of open good faith exchange, in the course of effects bargaining accompanying a closure should at least include</u> [sic]: 1) why the closure is taking place; 2) what, if anything, the Union, employees or employer could reasonably do to delay, forestall the closure or mitigate the detrimental effects of the closure; 3) the reasons for positions taken in developing, modifying or rejecting offers [or] counter offers; 4) the resources which might be available to effect compromise; 5) the possible retention, redeployment or liquidation of effected [sic] human or material resources; 6) what is necessary to establish an open and meaningful avenue of communication with decision makers; 7) steps that can be reasonably taken to mitigate the detrimental effects of the pending unemployment to employees, their dependent families or their community; and 8) the precise timing of the closure.

(Emphasis added).

The portion of the Order that reads, "rational foundational prerequisites of information which must be available, or the subjects of open good faith exchange, in the

course of effects bargaining accompanying a closure should at least include[,]" implies that all eight factors are per se requirements for an employer in every effects bargaining case accompanying a closure. However, imposing such requirements in every case is inconsistent with our case law.

In Del Monte I, this court noted that "[d]etermining whether bargaining parties exhibited a 'mutually genuine effort to reach an agreement with reference to the subject under negotiation,' HRS § 377-1(5), is by its nature an inquiry where hard-and-fast rules do not apply." Id. at 501 n.17, 146 P.3d at 1078 n.17 (emphasis added). Thus, evaluating an employer's conduct against per se requirements is inconsistent with focusing on the "totality of the employer's conduct." Id. at 500, 146 P.3d at 1078 (brackets omitted). Put another way, all eight factors listed in the HLRB Order may not be relevant in every effects bargaining case. Thus, imposing those requirements on an employer in every effects bargaining would be improper. This conclusion is consistent with an extensive body of federal caselaw, which evaluates whether an employer bargained in good faith by looking at the totality of the circumstances.[12] See,

---

[12] The HLRB's standard for assessing whether an employer violated its statutory duty to bargain in good faith, i.e., "whether the totality of the [employer's] conduct evinces a present intention to find a basis for agreement and a sincere effort to reach a common ground[,]" was derived from a leading federal labor law treatise. See Bd. of Educ., 6 HLRB 173, 177 (2001) (citing 1 The Developing Labor Law: The Board, The Courts, and the National Labor Relations Act 608 (Patrick Hardin et al. eds., 3d ed. 1992)). This court has also looked to the NLRA in interpreting the HERA's substantive provisions.
(continued...)

e.g., N.L.R.B. v. Truitt Mfg. Co., 351 U.S. 149, 153-154 (1956) (noting that "[e]ach case must turn upon its particular facts" and that "[t]he inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met"); Int'l Chem. Workers Council of the United Food & Commercial Workers Int'l v. N.L.R.B., 467 F.3d 742, 748 (9th Cir. 2006) (considering "whether the Company's actions as a whole satisfied its statutory obligation to bargain in good faith"); Frankl v. HTH Corp., 650 F.3d 1334, 1358 (9th Cir. 2011) ("To determine a party's good faith, the Board looks to the 'totality of the respondent's conduct, both at and away from the bargaining table.'") (citation and brackets omitted).

In sum, the law does not require employers to furnish all eight types of information, or bargain over the subject matter of that information, in every instance of effects bargaining accompanying a closure. Accordingly, this court's holding does not foreclose the possibility that a particular factor may be relevant, and thus appropriate for the HLRB to take into consideration, in evaluating the totality of an employer's conduct in an effects bargaining case.

## IV. Conclusion

We hold that the HLRB did not err in denying Del Monte's Disqualification Motion. We further hold that the HLRB

---

[12](...continued)
See Del Monte I, 112 Hawai'i at 503, 146 P.3d at 1080.

did not err in concluding that Del Monte bargained in bad faith during the first phase of negotiations. However, we also hold that the eight factors in the HLRB Order are not per se requirements in every effects bargaining case. Accordingly, the judgment of the ICA is affirmed.

| | |
|---|---|
| Christopher S. Yeh<br>for petitioners | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Rebecca L. Covert<br>and Davina W. Lam<br>for respondent | /s/ Simeon R. Acoba, Jr. |
| | /s/ Karen S.S. Ahn |
| | /s/ Steven S. Alm |

